2019 IL App (2d) 160162
No. 2-16-0162
Opinion filed June 13, 2019

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of McHenry County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 08-CF-562 |
| JUSTIN KNAPP, | ) ) ) | Honorable Sharon L. Prather, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE BIRKETT delivered the judgment of the court, with opinion.
Justice Burke concurred in the judgment and opinion.
Justice McLaren dissented, with opinion.

**OPINION**

¶ 1    Defendant Justin Knapp was convicted of attempted first degree murder (720 ILCS 5/8-4(a), 5/9-1(a)(1) (West 2008)), two counts of aggravated battery (720 ILCS 5/12-4(b)(1), (b)(8) (West 2008)) and mob action (720 ILCS 5/25-1(a)(1) (West 2008)).   The trial court sentenced defendant to 16 years in the Illinois Department of Corrections on the attempted first degree murder.   This court affirmed defendant's conviction in *People v. Knapp*, No. 2-09-0089 (2010) (unpublished summary order under Illinois Supreme Court Rule 23(c)).   On November 9, 2015, defendant filed a *pro se* petition pursuant to the Post Conviction Hearing Act (Act) (725 ILCS 5/122 *et seq.* (West 2014)).   The trial court summarily dismissed defendant's petition.

Defendant appeals from the summary dismissal. Because the record positively rebuts defendant's claim of ineffective assistance of trial counsel we affirm the summary dismissal and assess statutory State's Attorney fees.

¶ 2                                    I. BACKGROUND

¶ 3     Our decision in *Knapp I* was a summary order. A more detailed background is necessary to dispose of this appeal. On July 3, 2008, defendant and his co-defendant, Luis Rodriguez, were indicted for attempt first-degree murder, two counts of aggravated battery and mob action in connection with the June 10, 2008, stabbing of Jorge Avitia. The State's theory was that the defendants were members of the Nortenos 14 street gang and that the victim, Jorge Avitia, was affiliated with a rival gang, the Latin Kings. Prior to trial the State filed a motion *in limine* to introduce gang evidence on the issue of motive for the stabbing. The trial court deferred ruling on the motion. The State requested that two of its witnesses, Jorge Avitia and Andres Pedroza, be granted immunity regarding underage drinking. Defense counsel filed a motion to suppress a video-recorded statement defendant gave following his June 10, 2008, arrest. The State agreed to the suppression of the statement because defendant "asked for an attorney right off the bat." Defense counsel acknowledged that the recording was accurate in the event it was coming "in for another matter."

¶ 4                                    A. The Trial

¶ 5     Timothy Schroeder, a firefighter/paramedic with the Woodstock Fire Department, testified that at 5:24 a.m. on June 10, 2008, he responded to the scene of a stabbing outside an Aldi store in Woodstock. Police officers were already at the scene when Schroeder arrived. The male victim, Jorge Avitia, was on the ground and another male was standing over him. Avitia's pupils did not respond to any kind of stimuli, an early sign that his brain was beginning

to shut down. Avitia's clothes were removed, revealing that he had multiple stab wounds to his body. After the wounds were dressed, Avitia was provided advanced life support and transported to the hospital.

¶ 6 Nineteen-year-old Andres Pedroza testified that he had been friends with the defendant and Jorge Avitia since the third grade. On June 10, 2008, at 2:00 a.m. Pedroza was at his house in Crystal Lake along with defendant. Avitia came over to Pedroza's house. A short time later Christian Saenz, along with Luis Rodriguez, came over to Pedroza's house to pick the others up and drive to Woodstock. Pedroza did not know Luis Rodriguez, who sat in the passenger seat. On the way to Woodstock the group stopped at apartments in Crystal Lake. When the group arrived in Woodstock they went to a home behind the Aldi store. The group entered the home and sat in the living room. Christian Saenz left. Rodriguez and Avitia began to argue. Defendant was seated on a couch next to Pedroza. Pedroza heard Rodriguez say "F*** you, George" to Avitia. Rodriguez also called Avitia a "King killer." Pedroza testified that he guessed this was a reference to a gang, the Latin Kings. He did not know whether defendant was in a gang, but he knew defendant had tattoos on his arm and face. Some of his tattoos had four dots, which could be associated with the Nortenos, also known as the Nortenos 14 street gang.

¶ 7 Pedroza testified that after hearing the argument he said, "[l]et's go" to Avitia. The two left the house and headed toward the train station. Pedroza noticed that defendant and Rodriguez were following them. Pedroza heard Rodriguez say, "fourteen something" and also heard defendant say something. As defendant and Rodriguez closed in, they began hitting Avitia. Both men were punching Avitia in the body. Pedroza grabbed defendant and asked him and Rodriguez what they were doing. Pedroza believed Rodriguez hit Avitia one more

time. Defendant and Rodriguez then left. Avitia passed out and Pedroza called 911. The police drove Pedroza back to the house where the group had gathered. He identified defendant as one of the attackers. Pedroza recalled that either Rodriguez or defendant was holding "something shiny" before or after the attack.

¶ 8 On cross-examination Pedroza admitted he had been drinking before going to the house in Woodstock but he said that he stopped drinking before arriving there. The last act between Rodriguez and Avitia was when Rodriguez kicked him and Avitia went down.

¶ 9 Officer Jeremy Mortimer of the Woodstock police department testified that Avitia was covered in blood and unconscious when he arrived on the scene. Pedroza was trying to revive Avitia. Mortimer drove Pedroza to the house on Brick street where Pedroza identified defendant.

¶ 10 James Kelly testified that he lived at 672 Brick Street in Woodstock. Rodriguez was a friend of Kelly's and it was not unusual for him to bring people to Kelly's house to party. When Kelly arrived at home the night of June 9, 2008, Rodriguez and one of his friends were at his house. Kelly went to bed at about 12:30 a.m. on June 10, 2008. He recalled being awakened in the early morning and finding defendant inside his home. Defendant was pacing in front of the door and he asked Kelly to not open the door. Kelly told defendant to sit down and opened the door to allow the police to enter. Defendant sat on the couch "freaking out" and yelling at the police. Defendant threatened the police and Kelly because Kelly would not let him smoke. Kelly recalled defendant saying "some kind of gang thing about Nortenos." He characterized defendant as being "very aggressive."

¶ 11 Katrina Cardella testified that she was James Kelly's girlfriend and lived at his house on Brick Street. The morning of June 10, 2008, Cardella was awakened by the police banging on

the house. She had never seen defendant before defendant told her to not open the door. Kelly told defendant to calm down and sit down. Defendant told Cardella and Kelly that he was going to kill them. Defendant told the police officer that "he was going to rape and murder their wives." He was yelling "gang slogans about Fourteens and how he was a gang banger and they never die." Defendant asked the police if they knew where their children were. Cardella noticed that there was a knife missing from a set of knives in the kitchen. She identified State's exhibit 16, a knife recovered by the police outside the home, as the knife that was missing from the kitchen.

¶ 12    Woodstock police officer Daniel Henry was dispatched to the scene of the stabbing. Upon getting a description of the suspects he went to Brick Street. He saw defendant in front of the home at 672 Brick Street. Defendant was holding two gas cans. After seeing Henry, defendant ran inside the home. Henry knocked on the door and James Kelly allowed him inside.

¶ 13    Woodstock police officer Litner[1] was Daniel Henry's partner and assisted in defendant's arrest. Litner said defendant was very angry and kept repeating "Nortenos Fourteens." Defendant was screaming and shouting.

¶ 14    Officer Matt Harmon testified that while trying to make contact with the people inside 672 Brick Street he noticed a knife, identified as State's exhibit 16, outside another entrance at the back of the house. The knife had grass on it but did not have any blood on it. No fingerprints were recovered from the knife.

¶ 15    Jorge Avitia testified that he lived in Crystal Lake and he has been friends with defendant since the fourth grade. On June 16, 2008, at about 2:45 a.m., Avitia was at Pedroza's house

---

[1] Officer Litner's first name does not appear in the record.

when his friend Christian Saenz and another friend picked them up. Luis Rodriguez was with them. They drove to a house in Woodstock near the Aldi store. An argument broke out about "Nortenos and Kings." Avitia heard Rodriguez say "King killer" and "Nortenos love," which means "you get love for that gang, the street gang." Avitia knew that defendant was a member of the Nortenos street gang. After he and Pedroza left the house to head for the train station he was attacked by defendant and Rodriguez. Before the attack he heard them say "f*** you" and "Nortenos." Avitia yelled "f*** you" back at them. During the attack defendant was on his left and Rodriguez was on his right side. Both men were punching him. His next memory was waking up in the hospital. He suffered a puncture wound to his heart and two stab wounds to his stomach.

¶ 16 On cross-examination Avitia denied being a gang member. He did not know whether it was defendant or Rodriguez who stabbed him. On re-direct Avitia acknowledged that he is friends with some Latin King members and he admitted that he wears black and gold clothing, the King colors. Avitia said he had been friends with Latin King members for five years.

¶ 17 Office Paul Olazak from the Crystal Lake police department testified that defendant told him that he was a member of the Nortenos Fourteen street gang. The Nortenos Fourteen street gang is a rival of the Latin Kings.

¶ 18 Office Dimitri Boulahanis of the Crystal Lake police department testified as an expert on street gangs. He provided a history of the Latin Kings and the Nortenos Fourteen. Boulahanis said that defendant had four gang tattoos, wears the Nortenos Fourteen colors and has used hand gestures demonstrating that he was a member of that gang. Boulahanis had seen Jorge Avitia wearing Latin Kings colors predominantly over the years. He had seen Avitia socializing with

members of the Latin Kings in 2006 and 2007, although Avitia never admitted being of member of the Latin Kings.

¶ 19    Dr. Oscar Habab treated Avitia when he arrived at the hospital.    Avitia suffered three stab wounds.    The wounds were located below the left collarbone, in the left armpit and in the right lower abdomen.    Avitia's blood alcohol content was 0.18.

¶ 20    Dr. Amir Heydari performed surgery on Avitia.    Avitia had lost more than 500 ccs of blood.    He suffered a stab wound to the heart.    During surgery Avitia's heart stopped and he had to be fibrillated.

¶ 21    Forensic testimony established that reddish-brownish stains on defendant's shoe and watch were not a DNA match with Avitia's DNA.    The knife recovered outside Kelly's home was examined for fingerprints but none were found.    The State rested.

¶ 22    The defense offered certified statements of conviction to impeach two of the State's witnesses.    Kelly had a conviction for theft by deception under $300 and Avitia had been convicted of aggravated driving under the influence of alcohol.    Defendant rested.

¶ 23    During the jury instruction conferences prior to closing arguments the State requested that the trial court admonish defendant of his right to testify.    The following exchange took place:

> "THE COURT: I will. Thank you, Miss Kelly.    Sir, your attorney has just rested the defense case.    Have you discussed with Mr. Sugden (defense counsel) your right to testify?
>
> THE DEFENDANT: Yes, ma'am.
>
> THE COURT: Sir, is it your choice not to testify?
>
> THE DEFENDANT: Yes, ma'am.

THE COURT: You discussed this thoroughly with Mr. Sugden?

THE DEFENDANT: Yes.

THE COURT: You understand that the right to testify is a decision that you and you alone have the right to make but you should make that decision only after discussing it with your attorney. You have done that?

THE DEFENDANT: Yes, ma'am.

THE COURT: It's your choice not to testify?

THE DEFENDANT: Yes, ma'am.

THE COURT: Thank you.

DEFENSE COUNSEL: I have discussed it at great length with him and it's his decision and I respect it.

THE COURT: Okay. The record will so reflect. Thank you.

¶ 24 During closing argument, the State argued that the undisputed evidence showed that defendant participated in the attack on Avitia and that even if defendant did not actually do the stabbing, defendant was accountable for Rodriguez's conduct. The State argued that defendant's loyalty to the gang was more powerful than his friendship with Avitia that night.

¶ 25 Defense counsel argued that the State's evidence was weak. There was no scientific evidence to corroborate the State's theory. "No fingerprints. No blood. No photographs." Defense counsel argued that the State's gang theory made no sense. Avitia was aware of defendant's gang affiliation for years and vice versa. There was no reason for defendant to "suddenly go off." Defense counsel argued that everyone had been drinking and no one really knew what took place. The jury found defendant guilty on all counts.

¶ 26   Defendant appealed his conviction and sentence.   This court affirmed defendant's conviction and sentence on direct appeal in *People v. Knapp*, No. 2-09-0089 (2010) (unpublished summary order pursuant to Illinois Supreme Court Rule 23(c)).

¶ 27                              B. Post-Conviction

¶ 28   On November 19, 2015, defendant filed a *pro se* petition pursuant to the Act (725 ILCS 5/122 *et seq.* (West 2014)).   Defendant's petition raised three issues: actual innocence, involuntary waiver of his right to testify and ineffective assistance of appellate counsel.

¶ 29   In his petition defendant alleged that his decision not to testify was induced by "his attorney illegally withholding information critical to [his] decision thus rendering his decision involuntary."   Defendant alleged that he had several pretrial conversations with defense counsel regarding his right to testify.   He alleged that he told his attorney that the argument with Avitia inside the house was not about gangs but was about a female name Jackie Gutierrez.   He also told his attorney that he would testify that Luis Rodriguez was not a known member of the Nortenos street gang and that he had only met Rodriguez once prior to the events of June 10, 2008.   His attorney told him that his testimony regarding the argument inside the house was unnecessary, because Avitia's statement to the police "disavowed that the incident was gang related."   He said that his attorney told him that: his proposed testimony that the argument was about a girl was not supported by independent evidence; his testimony that Rodriguez was not a known member of the Nortenos would open the door for the State's gang expert; and his testimony that he had only met Rodriguez once before was not supported by any independent evidence.

¶ 30   Defendant alleged that he also had "in-trial conversations" with defense counsel about testifying.   He told defense counsel that: he only removed two gas cans from where Rodriguez

washed blood off his bands inside the bathroom; that he saw blood on Rodriguez's pants; and that Jackie Gutierrez was present at Rodriguez's house but left suddenly because of lewd comments to her by Rodriguez. As to each of these areas, defense counsel told him that his proposed testimony was unsupported by evidence. On January 28, 2016, the trial court dismissed defendant's petition by written order. The trial court found that the claim of actual innocence was insufficient and not supported by the documents attached to the petition. The trial court recharacterized defendant's second claim as a claim of ineffective assistance of trial counsel and found that this claim was barred by *res judicata* and forfeiture. The trial court found that defendant's claim of ineffective assistance of appellate counsel was frivolous and patently without merit. Defendant timely appealed the summary dismissal of his petition.

¶ 31                                II. ANALYSIS

¶ 32    On appeal, defendant argues only that the trial court erred with respect to his second claim, that trial counsel was ineffective for not allowing defendant to testify, citing *People v. Palmer*, 2017 IL App (4th) 150020, ¶ 17; *People v. Youngblood*, 389 Ill. App. 3d 209, 217 (2009) and *People v. Whiting*, 365 Ill. App. 3d 402, 408 (2006).

¶ 33                    A. Ineffective Assistance of Counsel

¶ 34    Defendant argues that the trial court erred in determining that his claim of ineffective assistance was procedurally barred because defendant "relies on matters that were not part of the record on direct appeal" citing *People v. West*, 187 Ill. 2d 418 (1999). He also argues that his petition presents the gist of a constitutional claim of ineffective assistance of trial counsel because while he "did not expressly state that he informed counsel he wanted to testify, he laid out in some detail the testimony he was prepared to present, and the reasons counsel would not allow him to testify." Defendant acknowledges that a postconviction petition may be

summarily dismissed where the allegations are positively rebutted by the record. *People v. Palmer*, 2017 IL App (4th) 150020, ¶ 23. He argues that the record does not positively rebut his claim because he has alleged that "his statements to the court regarding his waiver of his right to testify were the direct result of counsel's misrepresentation." He claims that based on the detail provided in his postconviction petition, we may infer that he communicated a desire to testify to defense counsel and counsel responded by convincing defendant not to testify, citing *Youngblood*, 389 Ill. App 3d at 224. Defendant contends that we should not take his statements regarding his waiver of his right to testify "at face value, as the *Palmer* court apparently did."[2] Defendant contends that it is arguable the he was prejudiced by counsel's advice that he should not testify.

¶ 35 The State does not challenge defendant's argument that the trial court erred in finding that his claim of ineffective assistance of trial counsel was procedurally barred. Instead, the State argues that we must affirm the trial court's dismissal of defendant's petition because defendant did not make a "contemporaneous assertion of his right to testify" citing *Youngblood*, 389 Ill. 3d at 217 and *People v. Brown*, 54 Ill. 2d 21, 24 (1973). The State argues that contrary to defendant's position, the record does not demonstrate that defense counsel would not allow defendant to testify, but rather that defendant chose not to testify after accepting counsel's advice. The State contends that where the record shows that a defendant unequivocally states that he is aware of his right to testify, but chooses to waive that right, he cannot later successfully

---

[2] In *Palmer*, the appellate court held that defendant's postconviction allegations that defense counsel refused to let him testify and that he contemporaneously told defense counsel of his desire to testify were positively rebutted by the record. *Palmer*, 2017 IL App (4th) 150020, ¶¶22-23.

argue that his decision to not testify was involuntary. It also argues that, even if we were to find that defense counsel's performance fell below professional standards, defendant cannot demonstrate that he was prejudiced.

¶ 36 The Act establishes a three-stage process for adjudicating postconviction petitions. 725 ILCS 5/122-1 *et seq.* (West 2014); *People v. Hommerson*, 2014 IL 115638, ¶ 7. At the first stage, the circuit court determines whether the petition is "frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2014); *Hommerson*, 2014 IL 115638, ¶ 7. At this stage of the proceedings "the court should only determine whether the petition alleges constitutional deprivations." *Id.* ¶ 10.

¶ 37 Here, the trial court dismissed defendant's postconviction petition claim of ineffective assistance of trial counsel, finding that the claim was barred by *res judicata* and forfeiture. Our review of a trial court's dismissal of a postconviction petition is *de novo*. *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). "We review the trial court's judgment, not the reasons cited, and we may affirm on any basis supported by the record if the judgment is correct." *People v. Anderson*, 401 Ill. App. 3d 134, 138 (2010). "Most postconviction petitions are drafted by *pro se* defendants, and accordingly, the threshold for a petition to survive the first stage review is low. *People v. Allen*, 2015 IL 113135 (2015) (citing *Hodges*, 234 Ill. 2d at 9 (2009)). To survive dismissal at the first stage the petition need only present "the gist of a constitutional claim." *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996). In evaluating the merits of a postconviction petition the trial court must accept all well-pleaded allegations as true, "unless the allegations are positively rebutted by the record." *People v. Youngblood*, 384 Ill. App. 3d 209, 214 (2009). If a petition presents "legal points arguable on their merits" it is not frivolous. *Hodges*, 234 Ill. 2d at 11. A petition may be dismissed as being "frivolous and patently without

merit only 'if the petition has no arguable basis in law or in fact'—relying on 'an indisputably meritless legal theory or a fanciful factual allegation.'" *Allen*, 2015 IL 113135, ¶ 25 (quoting *Hodges*, 234 Ill. 2d at 16-17). Legal theories that are meritless include ones that are completely contradicted by the record, while "[f]anciful factual allegations include those which are fantastic or delusional." *Hodges*, 234 Ill. 2d at 17. Our supreme court has consistently upheld the dismissal of postconviction petitions "when the record from the original trial proceedings contradicts the defendant's allegations." *People v. Rogers*, 197 Ill. 2d 216, 222 (2001).

¶ 38 To prevail on a claim of ineffective assistance of counsel, "a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different.' " *People v. Domegala*, 2013 IL 113688, ¶ 36 (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). A defendant alleging ineffective assistance of trial counsel "must overcome the strong presumption that the challenged action or inaction of counsel was the product of sound trial strategy and not incompetence." *People v. Coleman*, 183 Ill. 2d 366, 397 (1998).

¶ 39 Defendant's petition fails to establish even the gist of a claim that trial counsel's performance was deficient. Defendant acknowledges that in his petition he "did not expressly state that he informed counsel he wanted to testify." Instead, he asks us to infer from the details he provided that "he communicated a desire to testify to counsel both before and during trial." We reject this reasoning. A defendant in a criminal case has a constitutional right to testify in his own defense, but that right may be waived. In order to effectively waive his right to testify, "a defendant is not required to execute a specific type of waiver, nor is the trial court required to ascertain whether a defendant's silence is the result of a knowing and voluntary waiver to

testify." *In re Joshua B.*, 406 Ill. App. 3d 513, 515 (2011) (quoting *People v. Chatman*, 357 Ill. App. 3d 695, 703 (2005)). The decision whether to take the witness stand and testify belongs to the defendant "but it should be made with the advice of counsel." *People v. Smith*, 176 Ill. 2d 217, 235 (1997). As a general rule, advice not to testify is a matter of trial strategy that does not amount to ineffective assistance of counsel unless counsel refused to allow the defendant to testify. *Coleman*, 2011 IL App (1st) 1091005, ¶ 29 (citing *Youngblood*, 384 Ill. App. 3d at 215). It is clear from the record that trial counsel discussed "at great length" defendant's decision not to testify. "Thus, in the instant case, defendant's decision not to testify must be viewed as a strategy with which he agreed." *Youngblood*, 384 Ill. App. 3d at 235-36.

¶ 40    In *People v. Smith*, 176 Ill. 2d 217, 234 (1997), the supreme court noted that the vast majority of states have held that "a defendant's waiver of his right to testify is presumed if, as in the present case, he fails to testify or notify the court of his desire to do so." *Id*. at 234. In the instant case, we need not presume waiver as the court did in *Smith*. Here there was an on-the-record discussion regarding defendant's decision not to testify. There is nothing in the record that shows that at any time defendant told his lawyer that he wanted to testify despite advice to the contrary. *People v. Brown*, 54 Ill. 2d 21, 24 (1973). We cited *Brown* in *Youngblood* for the proposition that "[w]hen a defendant's postconviction claim that his trial counsel was ineffective for refusing to allow that defendant to testify is dismissed, the reviewing court must affirm the dismissal unless, during the defendant's trial, the defendant made a contemporaneous assertion *** of his right to testify." *Youngblood*, 389 Ill. App. 3d at 217 (quoting *Brown*, 54 Ill. 2d at 24). "Absent such an allegation, defendant has not stated the gist of a claim that his right to testify was violated by counsel." *Youngblood*, 389 Ill. App. 3d at 217.

¶ 41    The record also positively rebutted defendant's claim that trial counsel refused to allow him to testify.   The State asked the trial court to admonish defendant regarding his right to testify.   In *People v. Whiting*, 365 Ill. App. 3d 402, 410 (2006), this court stated that "[b]y creating a record that the defendant was aware that the right and decision to testify were his alone, a trial court would avoid creating a situation *** in which there is substantial doubt as to whether the defendant knowingly and voluntarily waived the right to testify on his or her own behalf."   Throughout the admonitions in this case defendant made no mention of any pressure from counsel.   He stated clearly that he understood the decision was his and his alone.   The record shows a knowing and intelligent waiver of the right made in consultation with counsel. We conclude that the trial court properly dismissed defendant's postconviction petition at the first stage of proceedings because defendant made no contemporaneous assertion of the right to testify.   We also hold that his claim that counsel refused to allow him to testify "is particularly rebutted by the record."   *People v. Palmer*, 2017 IL App (4th) 150020, ¶¶ 22-23.

¶ 42    Finally, even if we were to find deficient performance, defendant fails to establish prejudice.   Essentially, defendant's proposed testimony would have provided an alternative motive for the attack, *i.e.*, that the argument inside Rodriguez's house was over lewd comments made by Rodriguez to Jackie Gutierrez, who left shortly after the comments.   At oral argument we asked counsel what difference defendant's testimony would have made and he said, "I don't know."   Defendant did not indicate in his petition that had he been called to testify he would have denied participating in the attack.

¶ 43    The dissent accuses us of relying upon "outdated and inapplicable case law."   *Infra*, ¶ 70.   Yet the dissent does not bother to identify which cases are "outdated" or "inapplicable." Regardless of which stage a postconviction case reaches, when a defendant's claim is rebutted by

the record, the claim has no merit. Here, defendant was thoroughly admonished by the trial court regarding his right to testify and that it was his decision to make. The dissent's position is completely contrary to an opinion authored by the dissenting justice. In *People v. Whiting*, 365 Ill. App. 3d 402, 405 (2006), the defendant filed a post-trial motion alleging ineffective assistance of trial counsel. Whiting alleged that despite her desire to testify, trial counsel "told her that she could not testify on her own behalf." Whiting raised the issue prior to sentencing and her testimony regarding her desire to testify was uncontroverted. In reversing the defendant's conviction the majority in *Whiting* recommended that trial courts "place the matter on the record" and thus avoid creating a situation "where there is substantial doubt as to whether the defendant knowingly and voluntarily waived the right to testify on his or her own behalf." *Id*. at 410. The record in this case is free from doubt. What more would the dissent recommend to trial courts? Going beyond verifying that the defendant's decision not to testify is knowingly and voluntarily made would invade the attorney-client privilege.

¶ 44                              C. State's Attorney's Appeal Fee

¶ 45    After this case was submitted for decision, on our own motion we directed the parties to file supplemental briefs "addressing the State's request for statutory State's Attorney's fees pursuant to 55 ILCS 5/4-2002(a) and *People v. Nicholls*, 71 Ill. 2d 166 (1978), and also what effect, if any, the supreme court's decisions in *In re W.W.*, 97 Ill. 2d 53 (1983) and *People v. Johnson*, 2013 IL 114639, have on the State's request for fees in this case." Both parties have filed supplemental briefs.

¶ 46    In order to answer the fee question, we must construe section 4-2002(a) of the Counties Code. 55 ILCS 5/4-2002(a) (West 2016)) (State's attorney fees in counties under 3,000,000). In construing a statute, "our primary objective is to ascertain and give effect to the intent of the

legislature, given its plain and ordinary meaning." *Johnson*, 2013 IL 114639, ¶ 9. Where the language of a statute is clear and unambiguous, we must apply the statute as written. *Id.* If a term has a settled legal meaning, "the court will normally infer the legislature intended to incorporate the established meaning. *Id.* We review *de novo* questions of statutory construction. *Ries v. City of Chicago*, 242 Ill. 2d 205, 216 (2011). "When a statute has been judicially construed by the highest court having jurisdiction to pass on it, such a construction is as much a part of the statute as if plainly written into it originally." *Ray Schools-Chicago, Inc. v. Cummins*, 12 Ill. 2d 376, 380 (1957).

¶ 47 Defendant argues that the supreme court's decision in *Johnson* and *In re W.W.* implicitly overruled the supreme court's decision in *Nicholls*. We begin with *Nicholls,* where the supreme court held that the "State's Attorney is entitled to his fee when a convicted defendant is partially successful on appeal." *Nicholls*, 71 Ill. 2d at 178. That case involved an appeal from the denial of Nicholls' postconviction petition. After Nicholls lost his appeal in the appellate court, the State filed petitions in 28 criminal cases, including Nicholls', seeking fees from defendants who were unsuccessful in the appellate court. The appellate court issued a supplemental opinion, holding "that the State is entitled to have the State's Attorney's fees assessed against unsuccessful criminal appellants, including indigents." *People v. Nicholls*, 45 Ill. App. 3d 312, 322 (1977)). Only Nicholls appealed. In referring to the supplemental opinion, the supreme court noted, "that costs must be taxed in the court wherein they were incurred." *Nicholls*, 71 Ill. 2d at 171. The supreme court held that the legislative scheme "authorizes the assessment of State's Attorney's fees as costs in the appellate court against an unsuccessful criminal appellant upon affirmance of his conviction." *Id.* at 174.

¶ 48   In his supplemental reply brief defendant states that *Johnson* "addressed whether the *appeal fee* could be assessed against *habeas corpus* petitioners." (Emphasis added.) Defendant argues that in *Johnson*, the supreme court observed that "the legislature could have expanded section 4-2002(a) to include section 2-1401 petitions and postconviction petitions, but it has not done so." See *Johnson*, 2013 IL 114639, ¶ 12. Defendant's arguments miss the mark completely. In *Johnson*, the supreme court was interpreting a fee awarded in the *trial court* under section 4-2002.1 of the Counties Code. 55 ILCS 5/4-2002.1(a) (West 2008) (State's Attorney fees in counties of 3,000,000 or more population). The fee at issue was awarded by the trial court following a hearing on a petition for relief from judgment pursuant to section 2-1401 of the Code of Civil Procedure (Code). 735 ILCS 5/2-1401 (West 2008). The appellate court affirmed. *People v. Johnson*, 2012 IL App (1st) 111378. The supreme court allowed Johnson's petition for leave to appeal. In that appeal, Johnson argued that the $50 fee awarded by the trial court was not statutorily authorized since section 4-2002.1(a) of the Counties Code does not mention petitions for relief from judgment. *Johnson*, 2013 IL 114639, ¶ 6. The State responded by arguing that the fee should apply to all collateral proceedings in which the State is employed in the hearing of a case. *Id.* ¶ 7. The State argued that there was little reason to differentiate between collecting a fee when the State's Attorney is employed in the hearing of a case of *habeas corpus* or in the hearing of a section 2-1401 petition or postconviction petition. *Id.* The State argued that pursuant to the fee statute, the State's attorney shall be entitled to the following fees: "For each day employed in the hearing of a case of *habeas corpus* in which the people are interested." *Id.* ¶ 11; 55 ILCS 5/4-2002.1(a) (West 2008). The supreme court disagreed with the appellate court's reasoning that the statute referred to *habeas corpus* proceedings "generically" and was meant to encompass a petition

pursuant to section 2-1401 of the Code. *Id.* ¶ 10 (citing *Johnson*, 2012 IL App (1st) 11378, ¶ 13). The court held that giving the term *"habeas corpus"* in section 4-2002.1(a) of the Counties Code its plain and ordinary meaning, "it only applies to the various types of *habeas corpus* proceedings." *Id*. ¶ 12.

¶ 49    We reject defendant's argument that *Johnson* could be interpreted to implicitly overrule *Nicholls*. *Johnson* involved a completely different provision and not a fee assessed on appeal. We also reject defendant's argument that *Nicholls* has been implicitly overruled by the supreme court's decision in *In re W.W.*, 97 Ill. 2d 53 (1983). Defendant argues that in *In re W.W.*, the supreme court found that since juvenile proceedings are not criminal in nature, the $50 State's Attorney's appeal fee applying to the affirmance of criminal convictions was not applicable. *Id*. at 57-58. Defendant contends that postconviction proceedings are also not criminal in nature and the affirmance of a dismissal or denial of a postconviction petition is not the same thing as the affirmance of a criminal conviction, therefore, the State's Attorney appeal fee is not applicable. We disagree. The supreme court's analysis in *In re W.W.* was premised on the special nature of juvenile proceedings and the court's reluctance to characterize juvenile adjudications as convictions. *Id.* The special policy consideration ("humane concern for the minor") is not at play in postconviction proceedings where convicted *adult* criminals seek to overturn their convictions on appeal. See *People v. Lieberman*, 149 Ill. 2d 1052, 1057 (1986), *rev'd on other grounds*, 121 Ill. 2d 580 (1988). As the supreme court did in *Johnson*, we apply the statute at issue as written. Section 4-2002(a) of the Counties Code provides:

"State's attorneys *shall be entitled* to the following fees:

* * *

For each case of appeal taken from his county or from the county to which a change of venue is taken to his county to the Supreme or Appellate Court when prosecuted or defended by him, $50." (Emphasis added.) 55 ILCS 5/4-2002(a)) (West 2008) (State's attorney fees in counties under 3,000,000 population).

¶ 50 Unlike in *Johnson*, this statutory language does not limit the fee to certain types of appeals. In this case, the State's Attorney Appellate Prosecutor (SAAP) prosecuted defendant's appeal on behalf of the State's Attorney. As the supreme court stated in *People v. Kitch*, 239 Ill. 2d 452 (2011), under the applicable statutory scheme where SAAP prosecutes the appeal, it is proper to grant the State its $50 statutory assessment. *Id*. at 471. The State's request that defendant be assessed $50 as costs for this appeal is well taken.

¶ 51 Several appellate court decisions support our determination that the State's Attorney's appeal fee applies to appeals in postconviction cases. In *People v. Compton*, 77 Ill. App. 3d 1008 (1979), the defendant was sentenced to probation. The State filed a petition to revoke probation. The defendant was arrested on a warrant on the alleged violation and was also charged with a burglary. The defendant was unable to post pond on either the petition or the burglary count. At the conclusion of the hearing on the petition the trial court found that the State had proved the violation, however, the defense moved to dismiss because the State did not bring the defendant to a hearing within 14 days (see Ill. Rev. Stat. 1978, Supp., ch. 38, ¶ 1005-6-4(b)). The trial court dismissed the petition to revoke probation. The appellate court reversed and remanded. The State requested that the appellate court "tax costs accordingly." *Compton*, 77 Ill. App. 3d at 1009. The defendant argued that under *Nicholls*, "costs in the appellate court cannot be assessed to a defendant in cases where the State, rather than a criminal appellant, has taken the appeal." *Id.* The appellate court agreed with the State that *Nicholls*

does not preclude the imposition of costs. Quoting the language of the statute (formerly Ill. Rev. Stat. 1977, ch. 53, ¶ 8) the court stated that "[t]he above language expressly authorizes the assessment of costs in cases in which the State has prosecuted an appeal. This language, we believe, is sufficiently broad to encompass a State appeal from an adverse ruling in a probation revocation proceeding." The appellate court also said, "*Nicholls* involved among other matters an appeal by a defendant in a post-conviction proceeding which, we note, is civil in nature." *Id.* at 1010. The appellate court held that if costs may be assessed "against a defendant in a post-conviction proceeding, we find no justification for denying costs to the State upon its successful appeal from the trial court's dismissal of a petition to revoke a defendant's probation." *Id.*

¶ 52    As the supreme court noted in *People v. Agnew*, 105 Ill. 2d 275 (1985), the legislature reexamined the statute after *Nicholls*. Upon its reexamination the legislature did not limit the State's Attorney's fee on appeal to direct appeals following conviction. *Id.* at 279-80. Therefore, we must conclude that the interpretation of the statute in *Nicholls* reflects the legislative intent.

¶ 53    In *People v. Smith*, 133 Ill. App. 3d 613, 620 (1985), the appellate court noted that under *Nicholls*, "the State need only successfully defend a portion of the conviction on appeal in order to receive the fee." (The fee in that case was an award of a *per diem* fee.) The *Smith* court said, "[t]he rule may be simply stated as follows: The successful defense of any part of a criminal judgment challenged on appeal entitles the State to a *per diem* fee and costs for its effort." *Id.* at 620.

¶ 54    In *People v. Hible*, 2016 IL App (4th) 131096, the defendant appealed the trial court's dismissal of his petition for relief from judgment (735 ILCS 5/2-1401 (West 2010)). On

appeal, defendant challenged only that certain fines were improperly imposed by the clerk and that the defendant was entitled to presentence credit toward any new fines imposed on remand. *Hible*, 2016 IL App (4th) 131096, ¶ 7. The State agreed with both of the defendant's arguments; nevertheless, the State requested a $50 fee for defending the appeal. The State argued that *People v. Williams*, 235 Ill. 2d 286 (2009), supported its position that the State's Attorney's fee should be assessed. *Hible*, 2016 IL App (4th), ¶ 29. The defendant argued that the State was not entitled to the fee because the State "did nothing to defend the issue on appeal" (*Id.*, ¶ 30), citing *People v. Denson*, 407 Ill. App. 3d 1039 (2016). In *Denson*, the defendant raised a single issue on appeal and the State confessed error. With regard to the fee issue we said "[t]his court would have considered defendant's contention of error even if the State had not filed an appellee's brief." *Id.* at 1041. We therefore denied the State's request for fees. The Fourth District agreed with this court's reasoning in *Denson*. Since the State failed to successfully defend any issue on appeal it was not entitled to the statutory fee. *Hible*, 2016 IL App (4th) 131096, ¶ 33.

¶ 55 In *People v. Williams*, 384 Ill. App. 3d 327 (2008), the defendant appealed his convictions of aggravated battery and domestic battery. The defendant raised four issues on appeal and was successful on one. He argued in his reply brief that his success on one issue prevented the State from seeking costs. *Id.* at 341. The Fourth District appellate court disagreed, citing *People v. Nicholls*, 71 Ill. 2d 166, 178 (1978) (the appeal fee shall be taxed as costs unless judgment is entered in favor of the accused in full)." *Williams*, 384 Ill. App. 3d at 342. The supreme court allowed Williams' petition for leave to appeal to resolve a conflict in the appellate court over whether the State may recover costs on appeal when a defendant is partially successful. *Williams*, 235 Ill. 2d 286 (2009). The defendant relied on a series of

cases from this court holding that the State was not permitted to recover costs when the defendant had been partially successful. *Id*. at 291. The supreme court noted that its decision in *Nicholls* was not discussed in any of those opinions. *Id*. at 291 n.2. The supreme court stated that its interpretation of the State's Attorney's fee provision in its decision in *Nicholls* "is now part of the statute." *Id*. at 293. The court noted that the legislature "had not amended the relevant statutory language" in the 31 years since *Nicholls* despite an express invitation from the court to do so. *Id*. at 294. The *Williams* court said, "[d]efendant's other argument why this court should abandon *Nicholls* is that *Nicholls* failed to follow the rule that statutes in derogation of the common law must be strictly construed." *Id*. at 297. The court then provided a "see" cite to *In re W.W.*, 97 Ill. 2d 53, 56-58 (1983) (citing the rule of strict construction and refusing to award a fee request in a juvenile case because such cases are not criminal and do not result in convictions). The court noted that the first thing it said in *Nicholls* in analyzing the fee statute was that "the allowance and recovery of costs, being unknown at common law, rest entirely upon the statutory provisions, which *must* be strictly construed." *Williams*, 235 Ill. 2d at 294 (quoting *People v. Nicholls*, 71 Ill. 2d at 173). The language of the statute could not be more clear. The section at issue provides:

> "State's attorneys shall be entitled to the following fees:
>
> * * *
>
> For each case of appeal taken from his county or from the county to which a change of venue is taken to his county to the Supreme or Appellate Court when prosecuted or defended by him, $50." (Emphasis added.) 55 ILCS 5/4-2002(a) (West 2008)).

¶ 56    Our court has strictly construed this language and granted the State's request for fees in both postconviction cases and appeals from the denial of petitions for relief from judgment (735 ILCS 5/2-1401).   See *People v. Monroy-Jaimes*, 2019 IL App (2d) 160426; *People v. LaPointe*, 2018 IL App (2d) 160903; *People v. Richardson*, 2018 IL App (2d) 150737; *People v. Spivey*, 2017 IL App (2d) 140941; *People v. Huerta-Perez*, 2017 IL App (2d) 161104; *People v. Abdullah*, 2017 IL App (2d) 150840; *People v. Mujica*, 2016 IL App (2d) 140435.   Defendant fails to convince us that *Nicholls* does not control.

¶ 57    The dissent complains that "[t]he entire *Nicholls* decision is based on the false premise that a postconviction petition is a criminal case."   *Infra* ¶ 88.   The dissent also complains that the "unsuccessful criminal appellant" defined in *Nicholls* "leads to absurd results if applied to appeals from postconviction proceedings."   *Infra* ¶¶ 96-97.   Prior to our *sua sponte* order in this case directing the parties to submit supplemental briefs on the appeal fee question, our own research discovered only one case where an unsuccessful postconviction defendant challenged the appeal fee.   *People v. Lieberman*, 149 Ill. App. 3d 1052 (1986), *rev'd on other grounds*, 121 Ill. 2d 580.   In *Lieberman*, the First District Appellate Court rejected the defendant's reliance on *In re W.W.*, 97 Ill. 2d 53 (1983).   The First District stated:

> "Here, the appeal from the denial of the post-conviction petition is similar to the direct appeal from the underlying conviction.   Its aim is to overturn the conviction and obtain a new trial; it is an appeal of the underlying conviction.   Costs should attach." *Lieberman*, 149 Ill. App. 3d at 1058.[3]

_____

[3] The supreme court in *Lieberman* summarily reversed the appellate court, citing *People v. Porter*, 122 Ill. 2d 64 (1988), and remanded the case to the circuit court for further proceedings. *People v. Lieberman*, 12 Ill. 2d 580 (supervisory order).   The appellate court in *Lieberman* had

¶ 58    This has been the interpretation given to the section 4-2002(a), and to *Nicholls*, by every appellate district in our state.    As we have noted, the appeal fee has been awarded in appeals from the denial of relief from judgment under section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2016)).    See *People v. Banks*, 2016 Ill App (1st) 141665-U, ¶ 14-15; *People v. McDaniel*, 2016 Ill App (2d) 141061, ¶ 21; *People v. Garry*, 2017 Ill App (4th) 150373, ¶ 39).    The reason the fee has been awarded is obvious. As in postconviction cases, a section 2-1401 petition seeking to overturn a criminal conviction is a "case" wherein an appeal is taken in which the State's Attorney has "prosecuted or defended" the case on appeal (55 ILCS 5/4-2002(a) (West 2016)).

¶ 59    The dissent states that our "conclusion that appellate fees are collectible in collateral civil proceedings *** is not based in reality."    *Infra* ¶ 116.    Just the opposite is true.    The dissenting justice himself has been an author or panel member in several decisions awarding the appeal fee in postconviction cases.    See *People v. Spivey*, 2017 Ill App (2d) 140941; *People Luzaj*, 2017 Ill App (2d) 150596-U; *People v. Richardson*, 2018 Ill App (2d) 150737; *People v. Klein*, 2018 Ill App (2d) 151244-U.    In fact, the dissenting justice, as author in a recent appeal from the denial of a section 2-1401 petition, awarded appeal costs to the State.    See *People v. Abdullah*, 2018 Ill App (2d) 150840, ¶ 21 (McLaren, Burke, Birkett) ("As part of our judgment, we grant the State's request that defendant be assessed $50 as costs for this appeal.    55 ILCS 5/4-2002(a) (West 2016); see also *People v. Nicholls*, 71 Ill. 2d 166, 178 (1978).").

---

rejected the defendant's argument that the 30-day statutory limit to rule on a postconviction petition after its docketing was mandatory.    149 Ill. App. 3d at 1055.    In *Porter*, the supreme court concluded that "the 30-day rule was intended to be mandatory."    122 Ill. 2d at 85.

¶ 60    The dissent's fear that absurd results have or might follow from our interpretation of section 4-2002(a) is not supported by any examples.    As the dissent points out, there was no rationale provided in *Johnson* for not awarding the fee.    It may have simply been an oversight. Third, and needless to say, we are not bound by an opinion of another appellate district.    See *People v. Fretch*, 2017 IL App (2d) 151107, ¶ 154.

¶ 61    The dissent's discussion of *Johnson* is puzzling.    As we have pointed out (*supra*, ¶¶ 47-48), the fee at issue in *Johnson* was awarded in the trial court under a separate provision, section 4-2002.1(a) of the Code (55 ILCS 5/4-2002.1(a) (West 2008) ("State's attorney fees in counties of 3,000,000 or more population.").    See *Johnson*, 2013 IL 114639, ¶ 4.    The supreme court determined that the fee provision for "each day employed in the hearing of a case of *habeas corpus*" did not apply to a petition for relief from judgment under section 2-1401.    *Id.* ¶ 13.    The dissent notes that, in *Johnson*, the supreme court "disagreed" with the First District in *People v. Gutierrez*, 2011 Ill App (1st) 093499.    *Infra* ¶ 100.    In *Gutierrez*, the trial court awarded the $50 *habeas corpus* fee to the State following a first-stage dismissal of a *successive postconviction petition*.    The appellate court vacated the fee "because the State was not 'employed' in the hearing of the case."    *Gutierrez*, 2011 Ill App (1st) 093499, ¶ 65.    In *Johnson*, the supreme court overruled *Gutierrez*'s "assumption" that the *habeas corpus* fee applied to postconviction petitions.    *Johnson*, 2013 IL 114639, ¶ 13.    The court held that the *habeas corpus* fee "only applies to *habeas corpus* proceedings."    *Id.*    Contrary to the dissent, we have not been missing "the point on *Johnson vis-à-vis Nicholls*."    *Infra* ¶ 103.    The $50 appeal fee is specifically listed in section 4-2002(a) and is not limited to direct appeals.    The prosecution of a felony case begins with the return of an indictment or filing of an information and includes all the legal proceedings until the "final disposition of the case upon appeal" (720 ILCS

5/2-16 (West 2016)). As Yogi Berra said, and trial judges know, a "case" "ain't over till it's over."

¶ 62 One would think that if every appellate district awarding the State's Attorney appeal fee in collateral proceedings seeking to overturn a criminal conviction was in error, someone would have noticed. Recently, the supreme court affirmed this court's judgment in a postconviction case where we awarded the appeal fee. See *People v. DuPree*, 2017 IL App (2d) 141013-U, ¶ 59, *aff'd on other grounds*, 2018 IL 112307. Although the defendant did not challenge the fee award, our supreme court could have noticed that the fee was erroneous if that was the case.

¶ 63 The dissent states that our decision "clearly mischaracterizes the holding in *W.W.*" *Infra* ¶ 95. We disagree. Unlike the supreme court, we do not set policy. The dissent would limit the supreme court's decision in *W.W.* to its observation that "juvenile proceedings are not criminal in nature" (*W.W.*, 97 Ill. 2d at 57). *Infra* ¶ 95. Following the paragraph that the dissent quotes (*infra* ¶ 94), the supreme court in *W.W.* stated:

"We do not believe assessing a minor $50 for an unsuccessful appeal would further the purposes and policy expressed in the Juvenile Court Act. Nor do we find the legislature, through section 8, necessarily intended such an assessment. As this court said in *Nicholls*: 'In light of present-day county budgeting and accounting procedures, the provisions of section 8 (Ill.Rev.Stat.1975, ch. 53, par. 8) relating to State's Attorney fees may appear to be a relic of another era which might well merit the attention of the legislature.' (*People v. Nicholls* (1978), 71 Ill.2d 166, 179). Under these circumstances, we will not extend this provision by intendment or implication to assess State's Attorney fees on appeal against minors." *W.W.*, 97 Ill. 2d at 58.

This is clearly an expression of policy, or at the very least what the court believed the legislature intended. In stating that the State's Attorney's fees may not be awarded "on appeal against minors," the supreme court refers to *Nicholls*, but does not express any disagreement with *Nicholls*.

¶ 64 The dissent disagrees with the First District's interpretation of *W.W.* in *Lieberman* and notes that *Lieberman* "has never been cited for its fee analysis." *Infra* ¶ 95. Until this case and our *sua sponte* order directing the parties to address the issue, there has been no occasion to question the application of the appeal fee in postconviction cases. We note that American Law Reports summarizes the holding of *Nicholls* as follows:

"Where indigent defendant unsuccessfully appeal denial of post-conviction relief, costs for state's attorney's fee for defending appeal were properly assessed against defendant." H. C. Lind, Annotation, *Items of costs of prosecution for which defendant may be held*, 65 A.L.R.2d 854, ____ (1959).

This is an accurate interpretation of the court's holding.

¶ 65 Postconviction proceedings are initiated by adult defendants seeking to *overturn their convictions for felonies*. On appeal, whether from a first-, second-, or third-stage denial of relief, defendants in postconviction proceedings who are indigent are afforded the " ' right to a transcript of the record of the postconviction proceedings and to the appointment of counsel on appeal, both without cost to [the defendant].' " Ill S. Ct. R. 651(b) (eff. July 1, 2017). Final judgments in postconviction proceedings are reviewed pursuant to supreme court rules. 725 ILCS 5/122-7 (West 2016). Procedures for appeals in postconviction proceedings "shall be in accordance with rules governing criminal appeals." Ill. S. Ct. R.651(d) (eff. July 1, 2017). The State's Attorney or the State's Attorney Appellate Prosecutor represents the state in postconviction appeals. It is

absurd to conclude that the clear language of section 4-2002(a) is not intended to cover appeals in postconviction cases. The dissent would have us not only ignore the plain language of the statute but also ignore the underlying facts in *Nicholls*. Contrary to the dissent's contention (*infra* ¶ 91), there are decades of precedent supporting the award of fees in postconviction appeals.

¶ 66                                III. CONCLUSION

¶ 67    For the reasons stated, we affirm the trial court's order summarily dismissing defendant's postconviction claim of ineffective assistance. As part of our judgment, we grant the State's request that defendant be assessed $50 as costs for this appeal. 55 ILCS 5/4-2002(a) (West 2016); see also *People v. Nicholls*, 71 Ill. 2d 166, 178 (1978).

¶ 68    The judgment of the circuit court of McHenry County is affirmed.

¶ 69    Affirmed.

¶ 70    Justice McLaren, dissenting.

¶ 71    I respectfully dissent from both the majority's affirmance of the dismissal of defendant's postconviction petition and from its award of appellate fees to the State. Neither of the majority's actions here is supported by the established law of this state, and the majority relies on outdated and inapplicable caselaw to reach its conclusions.

¶ 72                                Petitioner's Appeal.

¶ 73    I first address the merits of petitioner's appeal. At the first stage, a postconviction petition need only present the gist of a constitutional claim; this is a low threshold, "requiring only that the petitioner plead sufficient facts to assert an arguably constitutional claim." *People v. Brown*, 236 Ill. 2d 175, 184 (2010). Yet the majority concludes that petitioner's allegations that defense counsel misinformed defendant about the evidence in the case and the applicable

law regarding the right to testify do not amount to even the low threshold of an "arguably" constitutional claim.

¶ 74    The majority acknowledges the fact that this case involves a first-stage dismissal of a postconviction petition, yet it pays this fact mere lip service.   It cites the appropriate boilerplate law; however, it then continuously cites to second- and third-stage postconviction cases such that it is impossible to determine what standards the majority has actually applied.

¶ 75    The majority opinion is replete with inapplicable caselaw.    The majority states:

> "To prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different."   (Internal quotation marks omitted.)    *People v. Domegala*, 2013 IL 113688, ¶ 36.

However, as our supreme court has noted, this analysis applies to a second-stage dismissal; a "different, more lenient formulation" is applied to a first stage dismissal:

> " 'At the first stage of postconviction proceedings under the Act, a petition alleging ineffective assistance may not be summarily dismissed if (i) it is *arguable* that counsel's performance fell below an objective standard of reasonableness and (ii) it is *arguable* that the defendant was prejudiced.' (Emphases added.)"   *People v. Tate*, 2012 IL 112214, ¶ 19 quoting *People v. Hodges*, 234 Ill. 2d 1, 17 (2009).

¶ 76    Quoting from *People v. Coleman*, 183 Ill. 2d 366, 397, the majority asserts that "[a] defendant alleging ineffective assistance of trial counsel 'must overcome the strong presumption that the challenged action or inaction of counsel was the product of sound trial strategy and not incompetence.' "    *Supra* ¶ 38.   Again, *Coleman* involved a second-stage dismissal.   At the

first stage, the defendant need not "overcome" anything; he need only present "the gist of a constitutional claim." *Gaultney*, 174 Ill. 2d at 418.

¶ 77 Relying on another case of *People v. Coleman*, 2011 IL App (1st) 091005, ¶ 29 and *Youngblood*, 389 Ill. App. 3d 209, the majority posits that, "[a]s a general rule, advice not to testify is a matter of trial strategy that does not amount to ineffective assistance of counsel unless counsel refused to allow the defendant to testify." *Supra* ¶ 39. However, our supreme court has held the "trial strategy" argument to be inappropriate for the first stage of postconviction proceedings. See *Tate*, 2012 IL 112214 ¶ 22. Thus, the fact that "trial counsel discussed 'at great length' defendant's decision not to testify" is irrelevant to the analysis here, as is the majority's reliance on *Youngblood*'s conclusion that "defendant's decision not to testify must be viewed as a strategy with which he agreed." See *supra* ¶ 39.

¶ 78 Like the case before us, *Youngblood* involved a first-stage dismissal. It also made the same error as the majority here. In addition to employing the inappropriate "trial strategy" analysis, *Youngblood* relied to a great extent on *People v. Brown*, 54 Ill. 2d 21 (1972), holding:

> "When a defendant's postconviction claim that his trial counsel was ineffective for refusing to allow the defendant to testify is dismissed, the reviewing court must affirm the dismissal unless, during the defendant's trial, the defendant made a 'contemporaneous assertion *** of his right to testify.' *People v. Brown*, 54 Ill. 2d 21, 24, (1973). Defendant's petition contains no allegation that he made any such assertion during the trial. Absent such an allegation, defendant has not stated the gist of a claim that his right to testify was violated by counsel." *Youngblood*, 389 Ill. App. 3d at 217.

¶ 79    First, I note that *Brown* did not involve a first-stage dismissal as frivolous or patently without merit; the petition in *Brown* was "dismissed upon motion."[4]    Thus, the dismissal referred to in *Brown* was not for failure to state the gist of a constitutional claim; it was for failure to make a second-stage *substantial showing* of a constitutional basis.    *Youngblood* then applied this second-stage dismissal protocol to a first-stage analysis, holding that the failure to allege that the petitioner told counsel that he wanted to testify made his allegation of ineffective assistance of counsel frivolous or patently without merit.

¶ 80    In the same vein, the majority's reliance on *Smith*, 176 Ill. 2d 217 (*supra* ¶ 40) is misplaced.    *Smith* involved a *direct appeal* after a sentencing hearing.    As the supreme court stated, "defendant does not assert that his counsel was ineffective for advising him to refrain from testifying at sentencing, nor does he indicate of what his testimony would have consisted" (i*d.* at 235), facts that are at odds with the facts of this case.    The majority fails to explain the relevance of this case.

¶ 81    All of this reliance on factually and legally inapposite cases leads to an improper analysis and an incorrect result.    At the first stage of postconviction proceedings, the court does not consider the petition on the merits; it determines "whether the petition *alleges* a constitutional infirmity which would necessitate relief under the Act."    (Emphasis in original.)    *People v. Smith*, 326 Ill. App. 3d 831, 839 (2001).    The first stage involves a pleading question; "[u]nless positively rebutted by the record, all well-pled facts are taken as true at this stage and the trial court's determination is subject to *de novo* review."    *Id.*    "Substantive questions relating to the

_____

[4] At the time of the *Brown* decision, there was no such first-stage dismissal.    The State was required to answer or move to dismiss the petition within 30 days.    See, *i.e.*, Ill. Rev. Stat. 1981 ch. 38 ¶ 122-5.

issues raised in the petition are not to be addressed at the first stage of the post-conviction proceeding." *Smith*, 326 Ill. App. 3d at 839-40. While the low first-stage threshold does not excuse a *pro se* petitioner from providing factual support for his claims, all that he is required to supply is a "sufficient factual basis to show the allegations in the petition are '*capable of objective or independent corroboration.*'" (Emphasis added.) *People v. Allen*, 2015 IL 113135, ¶ 24 quoting *People v. Collins*, 202 Ill. 2d 59, 67 (2002).

¶ 82    Certainly, petitioner's allegations here were capable of objective or independent corroboration. Petitioner provided an affidavit in which he stated that he had spoken to his attorney before trial about testifying but was told that, "because there was no evidence to support" his story, he "could not testify." During the trial, counsel again told him that "there had to be evidence supporting my version of events before he would let me testify. And since there still was nothing supporting me, I could not testify in my own defense." Further, counsel did not make petitioner aware of certain physical and circumstantial evidence in his possession that tended to support the proposed testimony. Petitioner stated, "Had I known such evidence existed, or that my right to testify was not contingent on any extrinsic evidence, I never would have waived my right to testify at trial."

¶ 83    The majority states that the record positively rebuts petitioner's claim that counsel refused to allow him to testify. *Supra* ¶ 41. According to the majority, defendant made no mention of any pressure from counsel during the trial court's admonishments; petitioner "stated clearly that he understood the decision [regarding testifying] was his and his alone" such that the record "shows a knowing and intelligent waiver of the right made in consultation with counsel." *Id*. First, the majority claims the record rebuts matters that are clearly not of record. This false conclusion is based on an enthymeme, presuming a false premise that is based upon the old

canard that the absence of evidence is evidence of absence. See *People v. Wills*, 217 IL App (2d) 150240, ¶ 69 (McLaren, J., specially concurring); *In re Rail Freight Fuel Surcharge Antitrust Litigation*, 725 F. 3d 244, 254 (D.C. Cir. 2013). The majority asserts that, since there is no evidence in the record to establish defendant's claim, the claim is therefore rebutted. If that were the law, matters outside the record would be conclusively presumed to have been rebutted by the very lack of such evidence on the record.

¶ 84    Second, petitioner's allegation is not that counsel pressured him not to testify or did not speak to him about his right to testify. The claim is that counsel misled defendant by misstating the law, telling him that he could not testify if he did not have extrinsic evidence supporting his proposed testimony. In addition, counsel did not tell him that certain evidence existed that would have supported his testimony, thus making his advice to defendant both legally and factually inaccurate. The trial court did not ask defendant if counsel correctly explained the rules of law pertaining to his right to testify or accurately told him of all of the evidence relevant to the case. I submit that, in order for the majority to properly conclude that the claim was rebutted by the record, the record should have contained an inquiry similar to the following: "Have you consulted with another attorney to determine that your counsel has properly advised you regarding your right to testify?" An affirmative answer would have rebutted the claims raised. A negative answer would have left the issue unresolved. The trial court's admonishments and questions in no way covered or addressed defendant's postconviction claims, let alone positively rebutted these claims.

¶ 85    Somehow, the majority misreads my use here of the rhetorical device of *reduction ad absurdum*[5] as a call for the use of such questioning and goes so far as to complain

---

[5] Translated from the Latin as "reduction to the absurd." "In logic, disproof of an

that such questioning "would invade the attorney-client privilege." *Supra* ¶ 43. Leaving aside the majority's lack of irony, and taking it at its word, I note that a defendant may waive the attorney-client privilege through the voluntary disclosure of confidential information. See *In re Grand Jury January 246*, 272 Ill. App. 3d 991, 997 (1995). The trial court can inquire of defense counsel regarding dealings with the defendant in a *Krankel* inquiry when a defendant files a *pro se* motion alleging ineffective assistance of counsel. See *People v. Ayres*, 2017 IL 120071, ¶ 12; *People v. Fields*, 2013 IL App (2d) 120945, 39. Further, even the State can call defense counsel to testify about his conversations with the defendant and refute allegations of ineffective assistance of counsel in postconviction proceedings. See *People v. Chatman*, 357 Ill. App. 3d 695, 697-98 (2005).

¶ 86    I am unsure what to make of the majority's confused analysis of *Whiting*. See *supra* ¶ 43. *Whiting* involved a claim that counsel told the defendant "that she could not testify on her own behalf at trial." *Whiting*, 365 Ill. App. 3d at 405. The majority here fails to comprehend that defendant's claim in this case is not that counsel refused to allow him to testify, but that counsel's advice to defendant was both legally and factually inaccurate such that he misled defendant into believing that his testimony would not be allowed. I still believe, as we said in *Whiting*, that we benefit from "a trial court's clarification of whether a defendant has knowingly waived this important constitutional right to testify, either by an admonishment by the court on the record, or on-the-record questioning of the defendant regarding the defendant's knowing waiver of that right." *Whiting*, 365 Ill. App. 3d at 410. Nothing that I have said in this dissent could be read as "contrary" to this. See *supra* ¶ 43. What I have said is that the

argument by showing that it leads to a ridiculous conclusion." Black's Law Dictionary 1305 (8th ed. 2004).

admonishments given in this case did not address, let alone positively rebut, defendant's postconviction claims. While such admonishments are beneficial, they are not guaranteed to reach the truth in every possible claim. *Whiting* never said, as the majority here apparently believes, that such admonishments are a cure-all for all claims involving a defendant's right to testify.

¶ 87 The majority also finds that, even if it found deficient performance, petitioner "fails to establish prejudice." *Supra* ¶ 42. Again, this analysis is inappropriate; defendant need merely show that it is *arguable* that he was prejudiced. *Tate*, 2012 IL 112214, ¶ 19.

¶ 88 Contrary to the majority's claim that defendant's proposed testimony would provide only an alternative motive, defendant's proposed testimony would arguably have attacked the credibility of both Avitia and Pedroza. For example, petitioner alleged that he wished to testify that the argument had nothing to do with gangs and was, instead, about a girl. According to petitioner, counsel told him that testimony about the lack of gang involvement was unnecessary because "Avitia's statement to police disavowed that the incident was gang-related" and that testimony that the argument involved a girl "was not supported by the evidence." However, at trial, Avitia testified that both the argument and the fight were gang-related.

¶ 89 Petitioner also wanted to testify regarding his own actions related to his possession of two gas cans just before his arrest. Various Woodstock police officers testified to seeing petitioner in front of the house at 672 Brink Street holding two red gas cans, finding the gas cans in the living room of the house when petitioner was apprehended, and the existence of a fire pit in the backyard of the house. In closing arguments, the State referred to this evidence as "the most powerful evidence that [petitioner] knew he had committed a criminal offense," stating:

"a reasonable inference is he was clearly afraid that he has gotten some blood on his clothing and he is going to burn his clothing in that back yard where the fire pit is and that is the only reason he would have gas cans containing gasoline in his hands and Officer Henry told you this is minutes after the offense. This is 7 to 10 minutes after the offense."

The State later further argued that "the circumstance evidence shows the intent he was going to go burn his clothes or conceal the evidence in this case somehow. That's what his intentions were."

¶ 90    Petitioner alleged that he told defense counsel that he "merely removed the two red plastic gas containers from near the fire pit in the backyard at 672 Brink Street after Rodriguez started a fire in an attempt to burn his bloodstained shirts."[6]   Counsel "dissuaded" petitioner from testifying because "there was no evidence supporting his claim."   Petitioner also attached photos and police reports from the Woodstock police department that, at least arguably, tie Rodriguez to the partially-burnt shirts found in the fire pit.   Thus, petitioner was not able to attempt to refute what the State referred to as "the most powerful evidence that [petitioner] knew he had committed a criminal offense" based on both legally and factually inaccurate statements from his counsel.   Again, petitioner need only show that arguably he was prejudiced; as the majority has applied the incorrect, higher standard, it has failed to properly address this portion of the ineffective assistance of counsel claim.

¶ 91    The majority has failed to analyze this first-stage proceeding properly.   It has applied the wrong standards and relied on inappropriate, distinguishable caselaw throughout its opinion.

---

[6] The majority incorrectly lists this claim as "he only removed two gas cans from where Rodriguez washed blood off his bands inside the bathroom."   *Supra* ¶ 30.

Incomplete or inaccurate information given to a defendant regarding his right to testify " 'is arguably a factor in consideration of whether counsel was ineffective.' " *People v. Lester*, 261 Ill. App. 3d 1075, 1079 (1994) quoting *People v. Nix*, 150 Ill. App. 3d 48, 51 (1986). After analyzing this case pursuant to the proper standards, I conclude that petitioner pled sufficient facts to assert an arguably constitutional claim (see *Brown*, 236 Ill. 2d at 184) such that the petition was neither frivolous nor without merit. I would reverse the trial court's dismissal and remand the cause for second-stage proceedings.

¶ 92                                 Appellate Fees

¶ 93    Both the majority's analysis regarding appellate fees under section 5/4-2002(a) of the Counties Code (Fee Statute) and the State's supplemental briefing on the issue are deficient. Among the many (16) fees enumerated in the Fee Statute is the fee accorded to State's Attorneys for "each case of appeal taken from his county or from the county to which a change of venue is taken to his county to the Supreme or Appellate Court when prosecuted or defended by him, $50." 55 ILCS 5/4-2002(a)) (West 2016). The issue before us in this case is whether that fee should be awarded in an appeal involving a postconviction petition. As the allowance and recovery of costs are unknown at common law and rest entirely upon statutory provisions, these provisions must be strictly construed. *Nicholls*, 71 Ill. 2d at 173. Strict construction does not require us to give words the narrowest possible meaning of which they are susceptible; however, when we strictly construe a statute, we "confine our construction to 'such subjects or applications as are obviously within its terms and purposes.' " *Khan v. BDO Seldman, LLP*, 408 Ill. App. 3d 564, 612 (2011) quoting *City of Elmhurst v. Buettgen*, 394 Ill. 248, 253 (1946).

¶ 94    The relevant issue as framed by the supreme court in *Nicholls* was whether the State's Attorney's fee "for defending an unsuccessful appeal by a convicted criminal defendant may be

assessed as costs." *Nicholls*, 71 Ill. 2d at 172.[7] The supreme court recognized "a legislative scheme which authorizes the assessment of State's Attorney's fees as costs in the appellate court against an unsuccessful criminal appellant upon affirmance of his conviction." *Nicholls*, 71 Ill. 2d at 174. This scheme was based on several statutory provisions, including: (1) the criminal costs statute, which provided, "When any person is convicted of an offense under any statute *** the court shall give judgment that the offender pay the costs of the prosecution." (Ill. Rev. Stat. 1975, ch. 38, ¶ 180-3 (subsequently renumbered as 725 ILCS 130/13 (1992) and repealed by Pub. Act 89-234, Art. 10, sec. 10-5, eff. Jan. 1, 1996)); (2) the Fee Statute, including the provision that "All the foregoing fees shall be taxed as costs to be collected from the defendant, if possible, upon conviction. ***"; and (3) section 22 of "An Act to revise the law in relation to costs" (now section 5-120 of the Code of Civil Procedure (735 ILCS 5/5-120 (West 2016)): "If any person shall take an appeal, *** and the same judgment be affirmed ***, the appellee shall recover his costs."

¶ 95 The majority here references a "legislative scheme" in *Nicholls* (*supra* ¶ 46) but fails to mention that the scheme included other legislation in addition to the Fee Statute. It is all of those statutes that, "when read together, indicate a legislative scheme which authorizes the assessment of State's Attorney's fees as costs in the appellate court against an unsuccessful criminal appellant upon affirmance of his conviction." *Nicholls*, 71 Ill. 2d at 174. The Fee Statute itself says nothing about "an unsuccessful criminal appellant upon affirmance of his conviction."

¶ 96 I was intrigued by the fact that the State never provided a pin cite to *Nicholls* in its request for fees. If the holding or *ratio decidendi* of *Nicholls* regarding the applicability of the appellate fee to postconviction appeals was so strong that the appellate defender would fail to file a response

---

[7] The other issues are not relevant to our decision here.

or even an objection to the request, why would the State not reference the page or pages upon which this nugget could be found? I noted that the majority, too, failed to provide a pin cite to *Nicholls*' discussion regarding appellate fees in postconviction cases. The majority does provide a pin cite to page 178 of *Nicholls* for the proposition that "the supreme court held that the 'State's Attorney is entitled to his fee when a convicted defendant is partially successful on appeal.' " *Supra* ¶ 46. Perusing page 178, one finds the word "conviction" used four times but not a single use of "post-conviction," "postconviction," or even "post." There is only one reference to post-conviction in *Nicholls,* in the factual scenario that led to the appeal:

> "His petition for post-conviction relief was denied by the circuit court of Madison County.
>
> He appealed, *in forma pauperis*, and the Appellate Court for the Fifth District affirmed the
>
> denial (*People v. Nicholls* (1975), 33 Ill.App.3d 650). Shortly thereafter the State filed
>
> petitions in the Appellate Court for the Fifth District *in 28 criminal cases, including that of*
>
> *defendant Nicholls*, in which the defendants had been unsuccessful in their appeals in that
>
> appellate court." (Emphasis added.) *Nicholls*, 71 Ill. 2d at 171.

These three sentences are the supreme court's perspective on the procedural status of the case.

¶ 97 These three sentences also constitute a counterfactual conditional. A counterfactual conditional is a subjunctive conditional containing an "if-clause" that is contrary to actual fact.[8] What is contrary to actual fact here is the statement that the case of defendant Nicholls is a criminal case.

¶ 98 In its supplemental opinion regarding fees, it is clear that both the parties and the appellate court in *Nicholls* characterized the consolidated cases as "criminal" cases: "The position advanced

_____

[8] The term counterfactual was coined by Nelson Goodman in 1947, extending Roderick Chisholm's (1946) notion of a "contrary-to-fact conditional."

on behalf of the indigent defendants is that the statutes do not authorize the appellate court to assess costs of an appeal and fees against a defendant and, alternatively, that in any event the appellate court is without authority to assess costs or fees against a defendant *in a criminal case* after the mandate has been issued." (Emphasis added.) *Nicholls* 45 Ill. App. 3d 312, 314 (1977). It is immaterial whether the State's Attorney in *Nicholls* overreached or the defendant forfeited the issue, either by accepting or, at least not objecting to, the characterization. The entire *Nicholls* decision is based on the false premise that a postconviction petition is a criminal case. In that false counter-factual context, *Nicholls* makes perfect sense and was cited approvingly by *Williams*, 235 Ill. 2d 286, a direct criminal appeal.

¶ 99    However, postconviction proceedings are civil, rather than criminal, in nature. See *People v. Ligon*, 239 Ill. 2d 94, 103 (2010). A postconviction proceeding is a collateral attack on the prior conviction or sentence that does not relitigate innocence or guilt. *Id.* The majority never addresses, let alone refutes, these facts.

¶ 100  The majority points to various procedures (appointment of counsel on appeal, free transcripts to indigent petitioners, representation of the state by the State's Attorney or the State's Attorney Appellate Prosecutor) as evidence of the criminal nature of postconviction proceeding. *Supra* ¶ 64. It also notes that, according to Supreme Court Rule 651(d), procedures for appeals in postconviction proceedings "shall be in accordance with rules governing criminal appeals." *Id.* Interestingly, Supreme Court Rule 660(a) provides that "[a]ppeals from final judgments in delinquent minor proceedings, except as otherwise specifically provided, shall be governed by the rules applicable to criminal cases." As we know from *In re W.W.*, 97 Ill. 2d 53 (1983) (see my detailed analysis *infra* ¶ 103), those proceedings are neither criminal proceedings nor amenable to

the imposition of appellate fees, yet they are, like postconviction appeals, governed by rules applicable to criminal cases. The governance by criminal appellate rules tells us nothing.

¶ 101    However, it is in the trial court that the civil nature of the postconviction proceedings is manifest. For example, "after a trial on the merits in a criminal case, there shall be no appeal from a judgment of acquittal." Ill. Const. 1970, art. VI, sec. 9. See also Supreme Court Rule 604(a) (eff. July 1, 2017), delineating the very limited circumstances in which the State may appeal. However, the right of the State to appeal from final judgments granting a petitioner postconviction relief is well established. See *People v. Scott*, 194 Ill. 2d 268, 278-79 (2000); *People Andretich*, 244 Ill. App. 3d 558, 560 (1993); *People v. Andson,* 73 Ill.App.3d 700, 701 (1979). Our supreme court has found this right to be based in great part on the fact that a postconviction proceeding, like the remedy available pursuant to a motion *coram nobis*, "is civil in nature." *People v. Joyce*, 1 Ill. 2d 225, 227 (1953). The State cannot appeal from final judgments in criminal cases, but it can appeal from judgments granting postconvition relief because of the civil nature of the postconviction proceeding. It is clear that the civil nature of the proceeding is substantive; the limited "criminal" procedures cited by the majority are, in fact, merely procedural. Again, the majority fails to accept this fact.

¶ 102    The civil nature of postconviction proceedings was recognized well before *Nicholls*. Both courts of review in *Johnson* recognized that postconviction petitions are collateral proceedings. See *Johnson*, 2013 IL 114639, ¶ 12 ("The statutory provision that allows imposition of the $50 [*habeas corpus*] fee first appeared in the statute in a 1907 amendment, and has remained unchanged, despite the creation of *additional collateral proceedings* such as a section 2-1401 petition and a postconviction petition." (Emphasis added.)); *Johnson*, 2012 IL App (1st) 111378 ¶ 13 ("the $50 State's Attorney [*habeas corpus*] fee applies to all collateral proceedings and the

term 'habeas corpus' when identifying what proceedings the State may recover a fee for is used generically")).  Later in this dissent, I point out that this counterfactual conditional, if carried to its logical end, results in absurd conclusions based on the majority's application of the holdings and *ratio deciendi* in *Nicholls*.  How so?  Because criminal proceedings are distinctly different from collateral civil proceedings as explained hereinafter.

¶ 103  The majority fails to explain why the holding in *Nicholls* applies to the situation before us.  This case does not involve a criminal appellant or the affirmance of a conviction.  The majority attempts a deflection by changing "affirmance of his conviction" to "failure to overturn his conviction."  A direct criminal appeal may result in the affirmance of a conviction.  An appeal from the dismissal of a collateral postconviction petition *never* results in the affirmance of a conviction.  Such an appeal can affirm the dismissal or can reverse the dismissal and remand the cause for further proceedings; either way, the conviction is never affirmed, for the conviction was never attacked.

¶ 104  The majority notes that *Nicholls* "involved an appeal from the denial of Nicholls' postconviction petition."  *Supra* ¶ 46.  However, nowhere does the majority examine the *Nicholls* court's analysis as to why the fee should be imposed in postconviction appeals.  That failure is understandable; the supreme court *never* addressed the applicability of the fee to postconviction appeals.   The petitioner's status as appealing from the denial of his postconviction petition is not mentioned in the issues on appeal, is not analyzed as affecting (or not) the imposition of the fee, and is not part of the *ratio decidendi* of the case.  Simply put, the appellant forfeited the issue by not contesting in the supreme court the appellate court's assertion that the proceeding was a criminal case.  The supreme court never addressed the issue, let alone the merits of what the majority claims is binding precedent.  The majority does not cite to any authority for

the proposition that a forfeited issue that is never addressed constitutes binding precedent, whereas I have cited authority to refute the anomaly created by the majority. It is difficult to comprehend how a counterfactual statement made in the appellate court, which was not contested in the supreme court, could possibly be deemed precedential when there is neither analysis, nor *ratio decidendi*, nor a grant of appellate fees in the supreme court. The majority relies on the twisted assumption that the absence of an objection to the request for fees in *Nicholls* is evidence of the merit of the request. There appear to be multiple oversights that the majority refuses to address except by citing to grants of fees in cases where the issue was forfeited by the petitioner. Our supreme court has defined "forfeited" to mean "issues that could have been raised, but were not, and are therefore barred." *People v. Blair*, 215 Ill. 2d 427, 443-44 (2005). The majority curiously fails to cite to authority for its assertion that forfeiture is a dispositive ruling on the merits rather than merely a forfeiture. I could cite to cases in which fees were not granted, but that would be giving credence to the claim that the cases cited by the majority have any merit other than as proof that the appellate defender in this district (and possibly others) forfeited the issue. Apparently, the failure of the supreme court to award fees in *Nicholls* and *Johnson* seems to be mere oversight or aberration to the majority. See *supra* ¶ 59. However, the failure of the appellate defender to object to a request for fees appears to the majority to be acquiescence or an admission.

¶ 105 The State refers to *Nicholls* as "our supreme court's most recent determination on the issued [*sic*] raised by this Court's question, and it is axiomatic that where the supreme court has 'declared the law on any point' this court is 'bound by such decision ***. [Citations.]' " The doctrine of *stare decisis* expresses the policy of courts to stand by precedent and to avoid disturbing settled points. See *People v. Sharpe*, 216 Ill. 2d 481, 519 (2005). Pursuant to this

doctrine, " 'a question once deliberately examined and decided should be considered as settled and closed to further argument.' " *Wakulich v. Mraz*, 203 Ill. 2d 223, 230 (2003) quoting *Prall v. Burckhartt*, 299 Ill. 19, 41 (1921). Like the majority, the State cannot point to where the issue of the applicability of the appellate fee in a postconviction petition appeal was mentioned in *Nicholls*, let alone where the supreme court "deliberately examined and decided" the issue. Certainly, it was not; the petitioner's status as a postconviction petitioner was merely incidental to the facts of the case and was left unexamined. I submit that the State's claim that *stare decisis* must be applied is the first instance in my appellate tenure wherein *stare decisis* has been based on nonexistant precedent.

¶ 106   As the *Nicholls* court noted, the State filed petitions in the appellate court in 28 "criminal" cases, including that of the petitioner, in which the defendants had been unsuccessful in their appeals, seeking judgment for State's Attorneys' fees of $60 in each case, including the $50 fee at issue here; all 28 petitions were consolidated for hearing and disposition, and the appellate court held that the State was entitled to the fees. See *Nicholls*, 71 Ill. 2d at 171. The supplemental opinion of the appellate court granting the fees (45 Ill. App. 3d 312 (1977)) was filed only in Nicholls' case. *Id.* at 171-72. The three issues presented to the supreme court are clearly stated; not one of them involves whether the State's Attorneys fee at issue before us should be granted after an unsuccessful appeal from the dismissal of a postconviction petition. We do not know whether any of the 27 other defendants had appealed from the denial of a postconviction petition; we do know that the supreme court assumed them to be criminal cases. The fact that *Nicholls* did *not* address or analyze the fact that is so central to the issue before us but merely noted its existence in one of 28 consolidated appeals repudiates *Nicholls*' precedential value in this case. See *U.S. Bank Nat. Ass'n v. In Retail Fund Algonquin Commons, LLC*, 2013 IL App (2d) 130213, ¶ 16

("Moreover, since *Kurle* did not discuss the issue of jurisdiction, we cannot deem it precedential on the question involved here."); *Doe 1 ex rel. Tanya S. v. North Cent. Behavioral Health Systems, Inc.*, 352 Ill. App. 3d 284, 287 (2004) ("The fact that the case does not address the issue contested here, whether there exists a private right of action, limits its precedential value."); *Smith v. Burkitt*, 342 Ill. App. 3d 365, 373 n. 1 (2003) ("However, in *Jackson*, the appellate court never addressed the reasonableness of the clause. \*\*\* As the court did not address the reasonableness of the clause in that case, we believe that case offers little precedential value for the issues before us on appeal."). Certainly, it does not have the force of *stare decisis*. The phrase "*stare decisis*" is itself an abbreviation of the Latin phrase "*stare decisis et non quieta movere*," which translates as "to stand by or adhere to decisions and not disturb that which is settled." See *People v. Trimarco*, 364 Ill. App. 3d 549, 555-56 (2006) (McLaren, J., dissenting). *Nicholls* settled only three issues "(1) Whether the State's Attorney's fee for defending an unsuccessful appeal by a convicted criminal defendant may be assessed as costs; (2) Whether a bail deposit posted for an accused may be used to satisfy the obligation for the State's Attorney's fee, notwithstanding the defendantss alleged indigency; [and] (3) Whether the State's Attorney is entitled to his fee when a convicted defendant is partially successful on appeal." *Nicholls*, 71 Ill. 2d at 172. *Nicholls* settled nothing regarding appellate fees in postconviction appeals. The majority is analyzing whether the glass is empty or full and determines that the glass is full; the problem is, the glass that the supreme court was referring to is *not* the glass the majority is referring to.

¶ 107   The generic applicability of the Fee Statute to *only* criminal cases was affirmed in *In re W.W.*, 97 Ill. 2d 53 (1983). In *W.W.*, the State was awarded the $50 State's Attorney appellate fee after defending in the appellate court the appeal of a minor who had been adjudicated delinquent and made a ward of the court. Our supreme court noted that the Fee Statute specifically provided

that "State's Attorney fees are to be taxed as costs and collected from the 'defendant,' if possible, upon 'conviction.' " *Id* at 57. However, juvenile proceedings are not criminal in nature; a minor is not convicted or considered either a defendant or an accused, and proceedings under the Juvenile Court Act do not result in a conviction. *Id*. The court found no clear legislative expression in the Fee Statute for imposing against minors State's Attorney fees for an unsuccessful appeal. *Id*. Further, the court found that assessment of the fee would not further the purposes and policies of the Juvenile Court Act and that it could not find that "the legislature, through section 8, necessarily intended such an assessment." *Id* at 58. Thus, the order assessing fees was vacated.[9]

¶ 108 The majority argues that the supreme court's analysis in *W.W.* "was premised on the special nature of juvenile proceedings and the court's reluctance to characterize juvenile adjudications as convictions." *Supra* ¶ 48. This language, though unattributed by the majority, is an almost-direct quote from *People v. Lieberman*, 149 Ill. App. 3d 1052, 1058 (1986), analyzing *W.W.*; it is not the supreme court's language from *W.W.*, nor is it the majority's own interpretation of *W.W.* Let us look at what the supreme court actually said in determining that the fee did not apply to the minor's appeal:

> "In strictly construing section 8 in favor of the minor, *we do not find a clear legislative expression* in its language imposing State's Attorney fees for an unsuccessful appeal against minors. In addition, *there is no juvenile costs statute similar to the*

---

[9] We note that the legislature subsequently amended section 8 of the Act to include a fee for "each proceeding in a circuit court to inquire into the alleged dependency or delinquency of any child." See 55 ILCS 5/4-2002(a) (West 2016). However, it did not include fees for all actions under the Juvenile Court Act, nor did it amend the statute to include fees for appeals from any juvenile proceedings.

*criminal costs statute* which, when read with section 8, would indicate a legislative scheme authorizing assessment of such costs. Nor do we believe such an assessment is clearly implied from the provisions in section 8.

Section 8 specifically provides that State's Attorney fees are to be taxed as costs and collected from the '*defendant*,' if possible, upon '*conviction*.' In *In re Beasley* (1977), 66 Ill.2d 385, 389, this court said *juvenile proceedings are not criminal in nature*. As such, a minor is neither 'convicted' nor considered a 'defendant' or an 'accused.' Nor is a proceeding under the Juvenile Court Act denominated a 'conviction.' (*In re R.R.* (1979), 75 Ill. App. 3d 494.) Rather, such proceedings are to be administered in a spirit of humane concern for the minor and to promote both the welfare of the minor and the best interests of the community. Ill. Rev. Stat. 1979, ch. 37, par. 701-2; *In re Beasley* (1977), 66 Ill. 2d 385, 389." (Emphases added.) *W.W.*, 97 Ill. 2d 57-58.

¶ 109 The majority's interpretation in our case is a deflection. The supreme court found neither a clear legislative intent to impose the fee in appeals from juvenile proceedings nor a juvenile costs statute that would be part of the "legislative scheme" described in *Nicholls*. Further, it specifically found that, according to established law, juvenile proceedings are not criminal in nature. The majority incorrectly characterizes as the supreme court's *ratio decidendi* a "reluctance to characterize juvenile adjudications as convictions" (*supra* ¶ 48) or a "policy" against extending the fee against minors (*supra* ¶ 62). On the contrary, the court simply and affirmatively stated and applied the existing law. The "special nature of juvenile proceedings" was not a basis for not imposing the fee; it was an explanation of the basis for *why* juvenile proceedings are not criminal in nature and, thus, not amenable to the imposition of the fee. The "policy" was also nothing new, as court had already found the lack of "a clear legislative

expression *** imposing State's Attorney fees for an unsuccessful appeal against minors." *W.W.*, 97 Ill. 2d at 57. *W.W.* was not about policy—it was about statutory construction. "[The State's] contention, however, ignores the well-established rule that statutes in derogation of the common law are to be strictly construed in favor of persons sought to be subjected to their operation. Our courts will read nothing into such statutes by intendment or implication." *W.W.*, 97 Ill. 2d at 57.

> "In strictly construing section 8 in favor of the minor, we do not find a clear legislative expression in its language imposing State's Attorney fees for an unsuccessful appeal against minors. In addition, there is no juvenile costs statute similar to the criminal costs statute which, when read with section 8, would indicate a legislative scheme authorizing assessment of such costs. Nor do we believe such an assessment is clearly implied from the provisions in section 8." *Id.*

For this same reason, I also disagree with *Lieberman*, which, I note, has never been cited for its fee analysis. The majority clearly mischaracterizes the holding in *W.W.*

¶ 110 Because the majority ignores the civil nature and unique status of postconviction proceedings, its position leads to absurd results. According to the Fee Statute, the $50 appeal fee "shall be taxed as costs to be collected from the defendant, if possible, upon conviction." 55 ILCS 5/4-2002 (West 2016.) However, "in cases of appeal *** where judgment is in favor of the accused, the fees allowed the State's attorney therein shall be retained out of the fines and forfeitures collected by them in other cases." *Id.* In *People v. Williams*, 235 Ill. 2d 286 (2009), our supreme court addressed the question of whether the State may recover costs on *direct* criminal appeal when the defendant is partially successful. The court noted that *Nicholls* had already resolved in the State's favor two arguments made by the State: first, "that the State's

Attorney must seek its fee from other sources only when the defendant obtains complete relief on appeal, such that he is *no longer a convicted defendant* following entry of the appellate court's judgment" (emphasis added) (*id.* at 291-92); and, second, that the language "where judgment is in favor of the accused" "must refer to a situation in which *the accused is no longer a convicted defendant* following the appeal" (emphasis added) (*id.* at 292). Thus, the "unsuccessful criminal appellant" referred to in *Nicholls* (71 Ill. 2d at 174), from whom the State may collect an appellate fee, is one who remains a convicted defendant after his appeal.

¶ 111 This definition leads to absurd results if applied to appeals from postconviction proceedings. In appeals from first- and second-stage dismissals of postconviction petitions, the petitioners seek a remand for further proceedings on the petitions, not a reversal or vacation of the convictions. Such is the case here; petitioner requested that this court "reverse the trial court's summary dismissal of his post-conviction petition and remand the case for second-stage post-conviction proceedings." Had we ruled in petitioner's favor and remanded the cause for further proceedings, most anyone would consider that to be a successful appeal. However, petitioner would still remain a "convicted defendant" after his appeal, such that, according to *Williams* (a direct criminal appeal), he would be considered "unsuccessful" and liable for paying the State's Attorney's fee. The majority fails to address this anomaly, let alone refute it.[10] Curiously, I have not been able to find a case wherein such fees were assessed by any court in any

_____

[10] Consistent with this illogic, the majority author here once declined to grant appellate fees to the State after a "successful" postconviction petitioner argued that he was not proven guilty of predatory sexual assault, only to have the appellate court *sua sponte* find that he was instead proven guilty of aggravated criminal sexual abuse and thereby modify his conviction. See *People v. Guerrero*, 2018 IL App (2d) 160920. The petitioner's other convictions were unaffected.

district or the supreme court in successful appeals from first or second stage dismissals. Is it merely coincidence, or is the lack of a reported case proof of the absurdity created by the counterfactual conditional in *Nicholls*? See *supra* ¶¶ 77-79. The methodologies and definitions from *Nicholls* and its progeny simply do not work when applied to appeals from postconviction proceedings, because such proceedings are *not* criminal in nature and are *not* direct challenges to the criminal convictions.

¶ 112 The majority misses the point of my argument here. I am not saying that unsuccessful postconviction petitioners challenging the appeal fee is absurd. See *supra* ¶ 56. I am saying that, under the *Nicholls* definition of "unsuccessful" as remaining a convicted defendant after the appeal, even an appellant who successfully challenges in this court the first-stage dismissal of his petition would remain a convicted defendant. Would the State then be awarded fees, since the petitioner is "unsuccessful" pursuant to *Nicholls*?

¶ 113 More recently, our supreme court addressed State's Attorneys fees in *Johnson*, 2013 IL 114639. The petitioner in *Johnson* had filed a petition pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2006)), which the trial court ultimately dismissed. The trial court also assessed numerous fees and costs against the petitioner, including a $50 fee for "each day actually employed in the hearing of a case of *habeas corpus* in which the people [*sic*] are interested." 55 ILCS 5/4-2002.1(a) (West 2010) (which is similar in most respects to section 4-2002(a) but applies to Cook County). The appellate court agreed with the imposition of the fee, holding that "the statute refers to *habeas corpus* proceedings generically and is meant to encompass frivolous section 2-1401 petitions for relief from judgment." *People v. Johnson*, 2012 IL App (1st) 111378 ¶ 13. The appellate court also held that the statute applied to all *collateral* proceedings, since the legislative intent was to deter frivolous filings. *Id.*

¶ 114   Our supreme court disagreed.   Giving the term "*habeas corpus*" its plain and ordinary meaning, the court concluded that it applied only to the various types of *habeas corpus* proceedings and rejected the State's contention that the fee should apply generically to all collateral proceedings.   *Johnson*, 2013 IL 114639, ¶ 12.   Stating that it would "not read words or meanings into a statute when the legislature has chosen not to include them," the court found that "any remedy lies with the legislature, not the courts, if the legislature may be so inclined."   *Id.*

¶ 115   Our interest in *Johnson* is three-fold.   First, our supreme court declined to give a broad reading to the Fee Statute.   Strictly construing the Fee Statute, the court noted that the statutory provision that allowed imposition of the fee first appeared in a 1907 amendment to the statute and had remained unchanged "despite the creation of additional *collateral* proceedings such as a section 2-1401 petition and a postconviction petition [which was created in 1949]."   (Emphasis added.)   *Id.*   The legislature could have amended the Fee Statute to include fees for other *collateral* proceedings as they were created, but it never did so, and the court would not read words or meanings into a statute when the legislature had chosen not to include them.   *Id.*   The court also disagreed with the unexplored "assumption" of the appellate court in *People v. Gutierrez*, 2011 IL App (1st) 093499 that "the fee could apply to a postconviction petition."   *Id.*

¶ 116   Second, I note the lack of appellate fees granted in the *Johnson* appeals.   While the appellate court (incorrectly) affirmed the State's request for the *habeas corpus* fee awarded in the trial court, I note that it declined *sub silencio* to grant the State's request, made pursuant to *Nicholls* and various statutes (including the Fee Statute) that the court "grant the People costs and incorporate as part of its judgment and mandate a fee of $100.00 for defending this appeal."   See page 8 of the State's appellate brief in *People v. Johnson*, No. 1-11-1378.   Thus, the appellate court, even while expansively reading the Fee Statute *vis-a-vis habeas corpus* fees, declined to

read the Fee Statute as allowing appellate fees for the appeal of that case. Further, the State did not cross-appeal the denial of the appellate fee when the case was appealed to the supreme court, nor did it seek the appeal fee for defending the appeal in the supreme court.

¶ 117 Third, it underscored the false premise in *Nicholls* that postconviction petitions are criminal proceedings. I note that an action brought under section 2-1401 is, like a postconviction proceeding, a civil proceeding, and it is subject to rules of civil practice " 'even when it is used to challenge a criminal conviction or sentence.' " *People v. Miles*, 2017 IL App (1st) 132719, ¶ 21, quoting *People v. Vincent*, 226 Ill. 2d 1, 6 (2007). Once again, the majority's analysis, if applied, would lead to an absurd result as applied to *Johnson*. The petitioner in *Johnson* successfully appealed his only issue in the supreme court, the imposition of the *habeas corpus per diem* fee. However, under the "no longer a convicted defendant following the appeal" definition of a successful appellant in *Williams* (see *supra* ¶ 84), the petitioner would still be subject to the imposition of the appellate fee, because he remained a convicted defendant after his appeal.

¶ 118 The majority completely misses the point on *Johnson vis-à-vis Nicholls*. It finds *Nicholls* to be controlling on the imposition of the appellate fee on a postconviction appeal when the issue was forfeited by the petitioner therein, yet it finds *Johnson* distinguishable even though the State sought (and was denied) the appellate fee in the appellate court and failed to appeal the denial or to seek the fee in the supreme court. Ultimately, it is not just the supreme court's reversal of the trial court's fee award that is important in *Johnson*. It is also (1) the lack of an award of appellate fees in the various *Johnson* appeals; and (2) the supreme court's rationale that no fee will be awarded if it is not specifically listed in the statute. The majority completely ignores these important aspects of *Johnson*. The majority also fails to accept the legal and factual declaration that postconviction petitions and section 2-1401 petitions are civil collateral proceedings as recognized by the State,

the appellate court, and the supreme court in *Johnson*, not, as *Nicholls* iterated as uncontested fact, criminal proceedings.

¶ 119   The majority states that a felony case "ain't over" until the "final disposition of the case upon appeal." *Supra* ¶ 60.   I agree.   For *res judicata* purposes, a judgment is not final until the possibility of appellate review has been exhausted.   See *Ballweg v. City of Springfield*, 114 Ill. 2d 107, 113 (1986); *Best Coin–Op, Inc. v. Old Willows Falls Condominium Association*, 158 Ill. App. 3d 492, 496 (1987).   However, with all due respect to the folk wisdom of Yogi Berra, this petitioner's criminal case was over a long time ago.   Petitioner did not seek leave to appeal from this court's affirmation of his conviction in his direct criminal appeal in *Knapp*, No. 2-09-0089 (2010).   As most judges know, "[p]ostconviction proceedings are not a continuation of, or an appeal from, the original case." *People v. Harris*, 224 Ill. 2d 115, 124 (2007). Instead, they are a collateral attack on the underlying judgment.   *People v. Evans*, 186 Ill.2d 83, 89 (1999) *Smith*, 326 Ill. App. 3d at 839.   Failure to recognize these basic facts again leads the majority to misstate the law.   The majority fails to accept the fact that, as Yogi said, "We made too many wrong mistakes."   The majority compounds the mistakes by refusing to address the patent absurdity of the premise contained in *Nicholls* that postconviction petitions are criminal proceedings and by going to great lengths to attempt to reconcile the absurd results flowing from that false premise.

¶ 120   Ironically, the State forfeited the issue of appellate fees in *Johnson* just as the petitioner in *Nicholls* did when he failed to claim the opposite, *i.e.*, that the postconviction petition was not a criminal proceeding and that the State was *not* entitled to the fee.   The majority fails to recognize the petitioner's forfeiture in *Nicholls* in order to claim prior precedent for awarding fees and then fails to recognize the State's forfeiture in *Johnson* in order to claim that *Johnson* doesn't apply to

appellate fees because the Supreme Court did not address their merits. This, despite the law of the case in *Johnson* that denied appellate fees and held that no fees could be collected in a civil, collateral proceeding unless the legislature included such proceedings in the Fee Statute.[11] The majority has actually limited the holding of *Johnson* on the basis of the State's forfeiture which, if anything, is counterintuitive, as it allows the State to continue to collect fees despite its failure to raise the appellate court's denial of fees in a cross-appeal. The majority has allowed the State to benefit from its patent and substantial forfeiture. *Johnson*'s holding was based upon an uncontested fact, actually a fact *admitted* by the State, that the proceedings were collateral civil proceedings. See *Johnson*, 2013 IL 114639, ¶ 7 ("The State responds that the fee should apply to all collateral proceedings in which the State is employed in the hearing of a case."). That admitted fact alone effectively overrules the counterfactual application of appellate fees to non-criminal proceedings in *Nicholls*. *Nicholls* is still valid as to criminal proceedings, *i.e.* the other 27 criminal cases, but it is not controlling here simply because the counterfactual assumption in *Nicholls* is no longer acceptable, as reality has been realigned and reaffirmed in *Johnson*.

---

[11] A reviewing court "may take judicial notice of briefs filed in another case." *People v. Mosley*, 2015 IL 115872, ¶ 16, n.6. See also *People v. Glasper*, 234 Ill. 2d 173, 190 (2009) ("We note at the outset that there is no indication that the *Zehr* court contemplated, or was even asked to contemplate, whether harmless error could apply. In fact, at defendant's behest, we have reviewed the briefs filed in *Zehr* and take judicial notice that the issue was not presented to the court."). See generally *People v. Mata*, 217 Ill. 2d 535, 539-40 (2005) ("we may take judicial notice of matters that are readily verifiable from sources of indisputable accuracy."). Similar to *Glasper*, my reference to the brief in *Johnson* is not to proclaim the merit of anything contained therein (or the lack thereof), but merely to note the fact that the State requested the fee in the brief.

¶ 121    While the Fee Statute generically applies to only criminal cases, the legislature has provided for certain fees in non-criminal cases, via the Fee Statute, in specified circumstances. For example, the Fee Statute provides for two separate trial court fees regarding paternity issues and a trial court fee for inquiries into a person's mental illness.   See 55 ILCS 5/4-2002(a) (West 2016).   After the supreme court's decision in *W.W.*, the legislature amended the statute to allow for a fee for "each proceeding in a circuit court to inquire into the alleged dependency or delinquency of any child."   See *id.*   However, it did not include fees for all actions under the Juvenile Court Act, such as neglect, nor did it amend the statute to include fees for appeals from any juvenile proceedings.   As we have seen in *Johnson*, the legislature long ago specifically provided for trial court fees in *habeas corpus* proceedings which, like postconviction petition proceedings, are civil, not criminal, in nature.   See *Alexander v. Pearson*, 354 Ill. App. 3d 643, 645 (2004).   However, these are specific inclusions in the statute.   Pursuant to the principle of *inclusio unius est exclusion alterius* (the inclusion of one thing in a statute is construed as the exclusion of all others), I must conclude, as did the *Johnson* court, that other civil proceedings, including appeals from postconviction petitions, are not included in the generically criminal Fee Statute.   See *In re Marriage of Holtorf*, 397 Ill. App. 3d 805, 810 (2010).   This is all the more apparent in the face of so many specific inclusions of civil fees in a generically criminal statute and *Johnson*'s clear holding that no civil collateral actions other than *habeas corpus* are included in the statute.

¶ 122    This principle is also manifest in the legislature's recent amendment of the Fee Statute.   In *Nicholls*, our supreme court noted: "In light of present-day county budgeting and accounting procedures, the provisions of section 8 [citation] relating to State's Attorney fees may appear to be a relic of another era which might well merit the attention of the legislature."   *Nicholls*, 71 Ill. 2d

at 179. The court reiterated this in *Johnson*, noting that the statute "has remained unchanged, despite the creation of additional collateral proceedings such as a section 2-1401 petition and a postconviction petition." *Johnson*, 2013 IL 114639, ¶ 12. Further, "[t]he legislature could have amended the statute to include additional collateral proceedings, but it never did." *Id.* The legislature finally heeded the supreme court's advice; however, instead of amending the Statute by adding the collateral proceedings as actions in which fees could be ordered, the legislature repealed the Fee Statute in its entirety, effective July 1, 2019. See P.A. 100-987, Art. 905, sec 905-43. Even then, the legislature could have added those proceedings for the limited duration of the Statute, but it clearly chose not to do so. The affirmative act of repealer without adding fees for collateral civil proceedings is clear evidence that the legislature did not intend to include these proceedings in the fee statute, as *Johnson* opined.

¶ 123 Statutes in derogation of the common law are to be strictly construed in favor of persons sought to be subjected to their operation; we are to read nothing into such statutes by intendment or implication. *W.W.*, 97 Ill. 2d at 57. Here, the Fee Statute, as interpreted by *Nicholls*, provides for state's attorney fees "as costs in the appellate court against an unsuccessful criminal appellant upon affirmance of his conviction." *Nicholls*, 71 Ill. 2d at 174. Strictly construing the Fee Statute in favor of petitioner, I can find no clear expression of an intent to impose the $50 appeal fee for an unsuccessful appeal from the dismissal of a civil, collateral postconviction petition. The Fee Statute generically applies to criminal cases, which a postconviction proceeding clearly is not, despite Mr. Nicholls' forfeiture of the appellate courts' misnomer labeling his proceeding a criminal case. Further, while the legislature has specifically provided for state's attorney fees in certain non-criminal proceedings, it has not done so for proceedings under the Postconviction Hearing Act. Thus, I can find no basis to impose such a fee here.

¶ 124   The majority claims to "apply the statute at issue as written" (*supra* ¶ 48).   However, the terms "juvenile proceedings" and "postconviction proceedings" cannot be found in the statute by the majority.   The arguments supporting the claim of "applying it as written" were raised in *W.W.* and *Johnson*.   Both decisions rejected the claim that the statute "as written" contained references to these proceedings.   See, *i.e.*, *W.W.*, 97 Ill. 2d at 57 ("In strictly construing section 8 in favor of the minor, we do not find a clear legislative expression in its language imposing State's Attorney fees for an unsuccessful appeal against minors.").   More importantly, *Johnson* excised any possible claim that postconviction proceedings are "written" in the statute.   The failure of the majority to even attempt to refute this exclusion substantiates that the majority's analysis is both unrealistic and reactionary.   Again, I must note that the supreme court in *Nicholls* did not apply the Fee Statute in a vacuum.   *Nicholls* recognized "a legislative scheme which authorizes the assessment of State's Attorney's fees as costs in the appellate court against an unsuccessful criminal appellant upon affirmance of his conviction."   *Nicholls*, 71 Ill. 2d at 174. This scheme involved two other distinct statutes.   See *supra* ¶ 75.   The majority fails to even follow the case that it incorrectly claims is precedentially dispositive here.

¶ 125   The majority cites a number of cases that are either immaterial, distinguishable, or interpreted in a misleading manner.   *People v. Kitch*, 239 Ill. 2d 452 (2011), as the majority states, found it proper to grant the State its $50 statutory assessment where the State's Attorney Appellate Prosecutor prosecuted the direct criminal appeal.   *Supra* ¶ 49.   This is a red herring. I have not suggested that granting a fee in a direct criminal appeal that is prosecuted by the SAAP resulting in the affirmance of a conviction is somehow remotely similar to a collateral proceeding.

¶ 126 *People v. Compton*, 77 Ill. App. 3d 1008 (1979), involved the issue of whether the State was entitled to appellate fees when it, rather than the defendant, took the appeal. The majority there cited to *Nicholls* in the same unthinking, mechanical way as many other cases, failing again to cite specifically where *Nicholls* allegedly considered and ruled on the application of the Fee Statute to an appeal from a postconviction proceeding.

¶ 127 The majority completely misinterprets *People v. Agnew*, 105 Ill. 2d 275 (1985). According to the majority, the supreme court in *Agnew* stated that the legislature examined the Fee Statute after the decision in *Nicholls* and "did not limit the State's Attorney's fee on appeal to direct appeals following conviction" such that "we must conclude that the interpretation of the statute in *Nicholls* reflects the legislative intent." *Supra* ¶ 51. Why would the legislature need to limit the fee to direct criminal appeals following conviction? *Nicholls* never said that the fee applied to civil or collateral appeals. *Nicholls* stated that it found "a legislative scheme which authorizes the assessment of State's Attorneys' fees as costs in the appellate court against an unsuccessful criminal appellant upon affirmance of his conviction." *Nicholls*, 71 Ill. 2d at 174. This sounds like direct criminal appeals following conviction to me. I note that *Agnew* involved a direct appeal after conviction. *Agnew*, 105 Ill. 2d at 277. In addition, the issue before us (the $50 appellate fee) was specifically *not* at issue in *Agnew*; the defendant there conceded that the fee was proper and contested only the assessment of the *per diem* fee that had been awarded to the State for oral argument on appeal. *Id*. at 278. As I have already demonstrated, *Nicholls* never examined, let alone ruled on, whether the appeal fee was appropriate in an appeal from the first-stage dismissal of a postconviction petition. See *Nicholls*, 71 Ill. 2d at 172 for the three issues presented to the court, none of which involves postconviction proceedings. Thus, any legislative examination of the Fee Statute in light of

*Nicholls* would have had little to say about awarding appellate fees in such a situation. As *Agnew* never examined the appellate fee at issue here, especially in a postconviction situation (the case never even used the word "postconviction"), the majority's citation to *Agnew* to support its assertion that, "[u]pon its reexamination the legislature did not limit the State's Attorney's fee on appeal to direct appeals following conviction. *Id.* at 279-80" (*supra* ¶ 51) is overly broad and woefully indiscriminate.[12]

¶ 128 The majority raises *Smith*, 133 Ill. App. 3d 613, which dealt with the award of a *per diem* fee for oral argument in the appellate court on a direct criminal appeal in which the defendant was partially successful. *Supra* ¶ 52. The majority quotes the court's summary of the rule of *Nicholls*: " 'The successful defense of any part of a criminal judgment challenged on appeal entitles the State to a *per diem* fee and costs for its efforts.' " *Supra* ¶ 52. What does this tell us about the case before us? This is another red herring, citing to a direct criminal appeal. Although it is consistent with *Nicholls*, it is being used by the majority to extend the error of *Nicholls*' counterfactual conditional and, as such, detracts from the credibility of the majority's ability to distinguish between direct criminal appeals and collateral appeals.

¶ 129 *Hible*, 2016 IL App (4th) 131096, involved an appeal from the dismissal of a section 2-1401 petition. On appeal, the State sought the imposition of the appellate fee; the defendant objected, arguing that the State was not entitled to the fee because it did not defend any issue on appeal. *Id.* ¶ 30. The appellate court found that "all parties, and this court, agree with the issues raised by defendant. The State is not 'defending' any claims made on appeal."

---

[12] I also find interesting that there is no indication in *Agnew* that the supreme court granted any appellate fees for the State's successful defense of the defendant's appeal to the supreme court.

*Id.* ¶ 31.   Thus, the court concluded that "the State has failed to successfully 'defend' any issue before this court and we deny its request for the statutory fee as costs." *Id.*   Again, the majority fails to explain how this is applicable to our case.   The *Hible* court declined to impose the appellate fee for the reason raised by the defendant: the State did not defend the appeal. The issue of whether the imposition of the appellate fee would be appropriate in an appeal from a section 2-1401 petition was not raised, let alone ruled on.

¶ 130   In an interesting turn, I note that *Hible* is the mirror-image of *Nicholls*.   The majority argues that *Nicholls* stands for the proposition that the imposition of the appellate fee in a postconviction appeal is appropriate because the defendant therein was appealing from the denial of his postconviction petition and the imposition of the fee was affirmed.   If that false logic is correct, so must this argument be: *Hible* stands for the proposition that the imposition of the appellate fee in a section 2-1401 appeal is *not* appropriate because the defendant therein was appealing from the denial of his section 2-1401 petition and the imposition of the fee was denied. In both cases, the situation from which the appeal arose (postconviction petition, section 2-1401 petition) was mentioned factually but never raised as an issue, analyzed by the court, or included in the *ratio decidendi* or holding of the court.   The State, and the majority, cannot have one without the other.   However, the correct outcome is that they get neither; an unanalyzed and unruled-upon fact is not precedential.

¶ 131   The majority also provides lists of cases in which this and other courts have granted appellate fees in appeals involving both postconviction and section 2-1401 petitions.   See *supra* ¶¶ 55, 57-58.   I could with ease assemble a list of just as many cases, plus one, in which courts did *not* award appellate fees.   But there is no point to such an exercise.   It is enough to say that

reviewing courts, including this one,[13] can make mistakes, erroneously relying on "established authority" instead of applying any real analysis. See *People v. Clark*, 2018 IL 122495, ¶ 61 (Neville, J., concurring in part and dissenting in part); see also *People v. Camacho*, 2016 IL App (1st) 140604, ¶ 52, overruled in part on other grounds, *Clark*, 2018 IL 122495, ¶¶ 22, 27). It is unfortunate that the majority here decides to rely on the "established authority" of a case that never analyzed, let alone ruled upon, the issue for which the majority holds it as precedential. A "real analysis" shows that *Nicholls* provides no basis for the imposition of appellate fees in this case.

¶ 132  In conclusion, the majority's conclusion that appellate fees are collectible in collateral civil proceedings (that *Nicholls* mischaracterized as criminal proceedings) is not based in reality. The decision here refuses to accept the holdings in numerous supreme court cases, including *Johnson*, that postconviction proceedings are civil proceedings that have not been included in the Fee statute, either specifically or by implication.

¶ 133  Having addressed the deficiencies of the majority draft, I submit the following disposition so that other panels that would deny appellate fees in appeals from collateral civil proceedings such as postconviction petitions and 2-1401 petitions may utilize it as a template.

¶ 134  The State claims that *People v. Nicholls* is controlling and that it stands for the proposition that fees may be assessed in postconviction appeals. *Nicholls* only mentions the term "post-conviction" once; in the third sentence of the opinion, the court said, "His petition for post-conviction relief was denied by the circuit court of Madison County." 71 Ill. 2d at 171. The court then continued with the following:

> "He appealed, in *forma pauperis*, and the Appellate Court for the Fifth District affirmed
> the denial (*People v. Nicholls* (1975) 33 Ill.App.3d 650). Shortly thereafter the State

---

[13] And this justice—*mea culpa, mea culpa, mea maxima culpa*!

filed petitions in the Appellate Court for the Fifth District *in 28 criminal cases, including that of defendant Nicholls*, in which the defendants had been unsuccessful in their appeals in that appellate court." (Emphasis added.) *Id.*

The statement that the postconviction proceeding was a criminal case is not only incorrect, it has been repudiated in a plethora of cases. The most salient case is *Johnson*, in which the State not only conceded but affirmatively argued that section 2-1401 petitions were *collateral* proceedings in which the trial court could award *habeas corpus per diem* fees pursuant to the Fee Statute. The appellate court agreed with both propositions, but the supreme court only agreed with the characterization of section 2-1401 proceedings as civil, collateral proceedings. The supreme court held that section 2-1401 proceedings and postconviction proceedings are not the same as *habeas corpus* proceedings and, thus, could not be deemed as included in the Fee Statute as the equivalents of *habeas corpus* proceedings. All the participants in *Johnson* recognized what *Nicholls* failed to realize: postconviction proceedings are *not* criminal proceedings and *Nicholls* has no application to civil collateral proceedings since, by its own terms, it was adjudicating 28 *criminal* proceedings. Interestingly, in *Johnson*, the State not only failed to cross-appeal the denial of fees by the appellate court, it also abandoned the characterization in *Nicholls* that postconviction petitions are criminal cases. If *Nicholls* is the alpha and omega, as proffered by the State, and is "followed" by the majority in this appeal, it is puzzling that the State failed to cite to *Nicholls* in its supreme court brief in *Johnson*. As the supreme court held in *In re W.W.*, if the legislature desires to authorize fees for appeals in non-criminal cases, the legislature must act to include such proceedings in the Fee Statute. After *W.W.*, the legislature did enact fees in certain juvenile court proceedings but did not include appellate fees in the enactment. The only action that the legislature has taken post-*Johnson* is to repeal the Fee Statute in its entirety. The

legislature had the opportunity to include civil collateral proceedings in the Fee Statute but did not do so. This failure to add such proceedings is an implicit ratification of the reality enunciated in *Johnson* that rejected and abrogated the mischaracterization perpetuated by *Nicholls* for decades.